**No. 26-1367**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

Lisa Tresslar

Appellant

v.

J. Jermaine Greene, Sr.
Craig A. Dally

Appellees

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania (Civ. No. 24-1435)
(The Honorable John M. Gallagher)

**BRIEF OF APPELLANT**
**And Joint Appendix - Volume I (Appx0001-Appx0022)**

Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

Date: July 27, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................iii-iv

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE ISSUES........................................................................1

STATEMENT OF RELATED CASES ...............................................................2

STATEMENT OF THE CASE ...........................................................................2

I.      Material Facts ...........................................................................................2

          A.     Tresslar's position and duties as Custody Master ................................2

          B.     The Revised Custody Guidelines and Tresslar's internal opposition ...3

          C.     Tresslar's January 12, 2023 remarks to the Family Law Committee ...4

          D.     Defendants learned of Tresslar's remarks, and Greene threatened her within two weeks.................................................................................5

          E.     The changes to Tresslar's role and her constructive discharge.............7

II.     Proceedings Below .................................................................................8

SUMMARY OF THE ARGUMENT .................................................................10

STANDARD OF REVIEW .................................................................................13

ARGUMENT ......................................................................................................14

I.      The District Court Erred in Granting Summary Judgment on Tresslar's First Amendment Retaliation Claim .................................................................14

          A.     The governing standards .....................................................................15

          B.     Tresslar's remarks to the Family Law Committee were citizen speech .............................................................................................................20

C.      The decision below rests on a misreading of *Flora* that inverts the holding of the case.................................................................24

D.      The District Court's rule that job-conferred access defeats First Amendment protection will lead to untenable results.........................28

E.      Independently, the District Court resolved genuinely disputed facts against Tresslar..................................................................31

II.     The District Court Abused Its Discretion in Striking Tresslar's Declaration.................................................................................32

A.      The declaration is not a sham affidavit ................................................34

B.      The declaration satisfies Rule 56(c)(4), and wholesale striking was improper in any event.........................................................35

CONCLUSION ....................................................................................37

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................13, 32

*Connick v. Myers*,
  461 U.S. 138 (1983) ..............................................................................................16

*De Ritis v. McGarrigle*,
  861 F.3d 444 (3d Cir. 2017) ...............................................................19, 26, 27, 28

*Dougherty v. Sch. Dist. of Phila.*,
  772 F.3d 979 (3d Cir. 2014) ...........................................................................*passim*

*Flora v. County of Luzerne*,
  776 F.3d 169 (3d Cir. 2015) ...........................................................................*passim*

*Foraker v. Chaffinch*,
  501 F.3d 231 (3d Cir. 2007) ..................................................................................19

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ......................................................................................*passim*

*Hill v. Borough of Kutztown*,
  455 F.3d 225 (3d Cir. 2006) ..................................................................................16

*Hill v. City of Scranton*,
  411 F.3d 118 (3d Cir. 2005) ..................................................................................15

*Javitz v. County of Luzerne*,
  940 F.3d 858 (3d Cir. 2019) ..........................................................................*passim*

*Kennedy v. Bremerton School District*,
  597 U.S. 507 (2022) ..............................................................................................17

*Lane v. Franks*,
  573 U.S. 228 (2014) ......................................................................................*passim*

*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968) ..................................................................................15, 16, 30

*SodexoMAGIC, LLC v. Drexel Univ.*,
  24 F.4th 183 (3d Cir. 2022) ..............................................................................14, 34

*Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*,
  971 F.3d 416 (3d Cir. 2020)......................................................................................16

**Constitutional Provisions**

U.S. Const. amend. I ...............................................................................*passim*

**Rules**

Fed. R. Civ. P. 56 ...................................................................................*passim*

Fed. R. Evid. 801 ..............................................................................................36

**Statutes**

28 U.S.C. §1291 .................................................................................................1

28 U.S.C. §1331 .................................................................................................1

42 U.S.C. §1983 .......................................................................................1, 9, 14

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction under 28 U.S.C. §1331 because Plaintiff-Appellant Lisa Tresslar's claim arises under the First Amendment to the United States Constitution and is brought under 42 U.S.C. §1983.

This Court has jurisdiction under 28 U.S.C. §1291. On February 2, 2026, the District Court entered a final order granting the motion for summary judgment filed by Defendants-Appellees Craig A. Dally and J. Jermaine Greene, Sr., dismissing all remaining claims with prejudice, and directing that the case be closed. (Dist. Ct. Dkt. 128, 129; Appx 0005-0022). The District Court's earlier order striking Tresslar's Declaration (Dist. Ct. Dkt. 117, Oct. 31, 2025; Appx 0004) was interlocutory. It merged into the final judgment, is reviewable on this appeal, and is expressly designated in Tresslar's timely notice of appeal. (Appx 0001-0003).

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in granting summary judgment on Tresslar's First Amendment retaliation claim by (1) holding that her remarks to the Northampton County Bar Association's Family Law Committee were made under her official duties, and therefore were not protected citizen speech, where the court applied the "related to" standard rejected by *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *Lane v. Franks*, 573 U.S. 228 (2014), and *Flora v. County of Luzerne*, 776 F.3d 169 (3d Cir. 2015); and (2) resolving genuinely disputed facts about the scope

of her duties against her. (*See* Appx 0756-0787; Appx 1406-1411; Appx 0005-0022).

2.     Whether the District Court abused its discretion under Federal Rule of Civil Procedure 56(c)(4) in striking Plaintiff's Declaration (Dist. Ct. Dkt. 100-4) in its entirety. (*See* Appx 1414-1421; Appx 0004).

## STATEMENT OF RELATED CASES

There are no pending cases or proceedings related to this appeal.

## STATEMENT OF THE CASE

### I.     Material Facts

### A.     Tresslar's position and duties as Custody Master.

Lisa Tresslar served as the Custody Master for the Northampton County Court of Common Pleas ("Northampton CCP") from 2014 until 2023, having been hired as its first full-time Child Custody Master. (Appx 0791 (Pl. Statement of Additional Material Facts ("Pl. SOMF") ¶8); Appx 0006 (Op. 1)). Her responsibilities centered on individual cases. She facilitated custody conferences between litigants, prepared case summaries, and sought settlement in individual matters, and, working within the court, she designed and implemented administrative procedures for the Custody Division. (Appx 0792-0794 (Pl. SOMF ¶¶13-15); Appx 0934-0935 (Baratta Decl. ¶¶5, 8)). Advocating policy positions to the Northampton County Bar Association or its committees was not among those duties. In a sworn declaration that the District

2

Court did not strike, Tresslar's supervisor, Judge Stephen Baratta, stated that he never asked Tresslar to act as a liaison to the Family Law Committee, never required her to become a member of the Bar Association or to attend its meetings, and would communicate with the Bar Association about the court's rules and procedures himself. (Appx 0938 (Baratta Decl. ¶¶24-25)). No judge or administrator ever instructed, assigned, or required Tresslar to attend or to speak at the Committee. (Appx 0802-0803 (Pl. SOMF ¶24)).

**B. The Revised Custody Guidelines and Tresslar's internal opposition.**

Beginning in late 2021, Northampton CCP set out to revise its custody guidelines (the "Revised Guidelines"). (Appx 0007 (Op. 2); Appx 0818 (Pl. SOMF ¶67)). Tresslar opposed them. In her view, the Revised Guidelines diminished the Custody Master's role, curtailed judges' access to her, and impaired her ability to settle custody cases and to help judges conduct custody hearings and trials. (Appx 0007 (Op. 2); Appx 0220-0260 (Tresslar June 16, 2022 Mem. to J. Morganelli)). She believed the changes would allow certain judges to pressure litigants into custody agreements and to disregard evidence of danger to children, concerns made vivid by the highly publicized murder of a child, Kayden Mancuso. (Appx 0819 (Pl. SOMF ¶70); Appx 0220-0260). Tresslar raised her concerns internally first, including in a June 2022 memorandum to Administrative Judge John Morganelli in which she expressed grave concerns about the motives behind the Revised Guidelines. (Appx

3

0819 (Pl. SOMF ¶¶69-71)). She was advised to confine herself to mechanical implementation issues. (Appx 0007 (Op. 2)).

### C. Tresslar's January 12, 2023 remarks to the Family Law Committee.

On January 12, 2023, Tresslar spoke at a meeting of the Family Law Committee of the Northampton County Bar Association (the "FLC"). (Appx 0822 (Pl. SOMF ¶83)). The FLC is a committee of the county bar, not an arm of Northampton CCP. (Appx 0007 (Op. 2); Appx 0821 (Pl. SOMF ¶79)). Tresslar was neither a member of it nor a designated representative of the court to it. (Appx 0019; Appx 0938 (Baratta Decl. ¶24)). She addressed an audience of roughly 30 family law attorneys for more than two hours. (Appx 0822 (Pl. SOMF ¶83); Appx 0673-0674 (Kruzel Dep. 75-76, 82-83)).

Tresslar's remarks at the meeting were not confined to the mechanics of the Revised Guidelines. (Appx 0008 (Op. 3); Appx 1094-1095 (Crouthamel Dep. 42-43, 47)). Almost all of them concerned asserted judicial misconduct. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 1095 (Crouthamel Dep. 46-47); Appx 1102 (Kingsley Dep. 42-43)). She described specific instances in which sitting judges had pressured parties into custody settlements, told litigants they could lose custody of their children if they went to trial, and refused to read the case summaries and expert reports that documented danger to the children involved. (Appx 0822-0824 (Pl.

SOMF ¶85); Appx 1101-1102 (Kingsley Dep. 39-43); Appx 1094-1095 (Crouthamel Dep. 42-49)). And she warned the Committee that the Revised Guidelines would permit judges to continue coercing litigants into custody agreements and disregarding their duty to hear the evidence and to protect children. (Appx 0008 (Op. 3); Appx 0675 (Kruzel Dep. 87-88); Appx 1094-1095 (Crouthamel Dep. 44-46); Appx 1101-1102 (Kingsley Dep. 40-43)).

She recommended no outcome in any individual case and voiced no grievance about her own pay or working conditions. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 1101-1102 (Kingsley Dep. 39-43); Appx 1094-1095 (Crouthamel Dep. 42-49)). She spoke to systemic custody practices and the integrity of the county's family courts, matters that affect litigants, families, and children throughout the county. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 1101-1102 (Kingsley Dep. 40-43)). She conveyed no official position of Northampton CCP and made no report to court leadership afterward. (Appx 0938 (Baratta Decl. ¶25); Appx 0699 (Koury Dep. 79-80)). To the contrary, she had been warned in a November 10, 2022 letter not to publicly criticize a judge, and she spoke at the meeting despite that directive, at the risk of reprisal. (Appx 0821 (Pl. SOMF ¶76); Appx 0160-0163 (Nov. 10, 2022 Letter)).

**D.     Defendants learned of Tresslar's remarks, and Greene threatened her within two weeks.**

Defendants learned of Tresslar's remarks. Judge Koury, then the President Judge, testified that he was aware Tresslar had spoken at the January 12 meeting and

5

understood that she had spoken about the court's rules. (Appx 0699 (Koury Dep. 79-80)). Greene admitted the same. He testified that, although he was away when Tresslar spoke, Judge Koury told him upon his return that Tresslar had "**spoke[n] at the Family Law against the rules**[.]" (Appx 0655 (Greene Dep. 242-43) (emphasis added); Appx 0825-0827 (Pl. SOMF ¶87)).

Judge Dally's knowledge is documented in his own correspondence. On July 14, 2023, Judge Dally forwarded to Greene an email in which Tresslar recounted her June 2022 memorandum and her attendance at the January 2023 Committee meeting, "at which members unanimously agreed they were opposed to the same provisions." (Appx 0826 (Pl. SOMF ¶87)). Greene's September 13, 2023 email to Judge Dally quoted Tresslar's message back to him, and Judge Dally admitted at his deposition that he received it. (Appx 1098 (Dally Dep. 90-91)). The record contains additional documentary and testimonial evidence of Defendants' awareness of Tresslar's remarks. (Appx 0825-0829 (Pl. SOMF ¶¶87-88)).

Greene's reaction was swift. On January 25, 2023, two weeks after the FLC meeting, he confronted Tresslar. He accused her of arriving late to a custody conference the previous day and was, in her words, furious. (Appx 1153-1154 (Tresslar Dep. 170-74)). He told her that working outside regular business hours proved she had a "time-management problem." (Appx 1153 (Tresslar Dep. 171)). And he told her that "the day will come" when he would be put in charge of the

custody office and would be her supervisor. (Appx 1153 (Tresslar Dep. 170-71)).

Tresslar understood from the timing that Greene had heard about her speech and intended to retaliate. (Appx 1154 (Tresslar Dep. 175-76)). While Judge Koury remained President Judge, Greene could not act on those threats, and no formal adverse action was taken against her at that time. (Appx 1153 (Tresslar Dep. 170)). The District Court did not reach the causation element of Tresslar's claim, but on this record there is no genuine dispute that both remaining Defendants knew of Tresslar's speech, and that Greene, the administrator who later carried out the changes to her role, had threatened those changes within two weeks of it.

### E.    The changes to Tresslar's role and her constructive discharge.

In May 2023, Judge Dally became President Judge of Northampton CCP, and in July 2023 he promulgated new Custody Division procedures adopting the Revised Guidelines. (Appx 0008 (Op. 3); Appx 0832 (Pl. SOMF ¶105)). After Tresslar emailed Judge Dally reasserting her opposition (Appx 0825-0827 (Pl. SOMF ¶87)), her role was diminished. Judge Dally testified that he allowed Greene to manage the custody office employees and did not "micromanage" him. (Appx 1097 (Dally Dep. 55-57)). With Judge Koury gone, Greene was at last in a position to carry out the threats he had made in January, and he did. (Appx 0832 (Pl. SOMF ¶¶107-08)). Supervisory authority over her was shifted to Court Administrator Greene.

She was then subordinated to a part-time custody master. (Appx 0833-0834

(Pl. SOMF ¶¶110-16)). Greene reversed the case assignments between the two, so that two-thirds of the part-time master's conferences involved represented litigants while two-thirds of Tresslar's involved unrepresented litigants. (Appx 0833-0834 (Pl. SOMF ¶114)). He restricted Tresslar's discretion in managing cases and facilitating settlement, directing her to end each custody conference at its scheduled one-hour mark, while allowing the part-time master unlimited time for hers. (Appx 0833 (Pl. SOMF ¶113)). He directed the custody office's two clerical assistants to prioritize the part-time master's work over Tresslar's, and on September 11, 2023, he fired Tresslar's most experienced clerical assistant and did not replace her, forcing Tresslar to perform much of her own clerical work. (Appx 0834-0835 (Pl. SOMF ¶¶116, 118-19); Appx 0293-0316 (Tresslar Oct. 9, 2023 Mem.)). On October 11, 2023, Judges Dally and Morganelli briefly restored her former role, but Judge Dally reversed that decision the next day after Greene complained to the Administrative Office of Pennsylvania Courts. (Appx 0836-0837 (Pl. SOMF ¶¶125-29); Appx 1126-1127 (Morganelli Dep. 54-58)).

Two days later, on October 14, 2023, Tresslar resigned. (Appx 0838 (Pl. SOMF ¶132); Appx 0148-0156 (Resignation Letter)).

## II.     Proceedings Below

Tresslar filed suit in April 2024. (Dist. Ct. Dkt. 1; Appx 0009). Her June 27, 2024 Amended Complaint named as defendants the Northampton County Court of

Common Pleas, Northampton County, Court Administrator Greene, President Judge Dally, and Judges Jennifer Sletvold and Paula Roscioli, and pleaded Title VII sex discrimination (Count I), Title VII retaliation (Count II), First Amendment retaliation under 42 U.S.C. §1983 (Count III), and a violation of the Equal Protection Clause (Count IV). (Dist. Ct. Dkt. 18; Appx 0037-0057).

The case narrowed at every stage. On October 18, 2024, the District Court dismissed the sex discrimination and equal protection counts and dismissed all claims against Judges Sletvold and Roscioli, leaving a Title VII retaliation claim against Northampton CCP and the First Amendment retaliation claim against Defendants Greene and Dally. (Dist. Ct. Dkt. 40; Appx 0009). Tresslar then voluntarily dismissed her Title VII retaliation claim on July 15, 2025, which removed Northampton CCP from the case. (Dist. Ct. Dkt. 77; Appx 0009). What remained was a single claim against two Defendants, First Amendment retaliation against Court Administrator Greene and President Judge Dally.

Defendants moved for summary judgment. (Dist. Ct. Dkt. 95). While that motion was pending, the District Court struck Tresslar's summary judgment declaration in its entirety. (Dist. Ct. Dkt. 117). After briefing and oral argument on December 17, 2025, the District Court granted summary judgment on February 2, 2026, holding that Tresslar's remarks to the Committee were made under her official duties and therefore were not protected citizen speech, and dismissing her remaining

9

claim with prejudice. (Dist. Ct. Dkt. 128, 129; Appx 0005-0022). Tresslar timely appealed. (Appx 0001-0003).

On appeal, Tresslar challenges (1) the dismissal of her First Amendment claim as it rests on her January 12, 2023 remarks to the Family Law Committee, and (2) the order striking her summary judgment declaration.

## SUMMARY OF THE ARGUMENT

This is an important First Amendment case. It presents a question that recurs across public employment. When a government employee speaks out about a matter she came to know through her work, does she speak as a citizen, protected from retaliation, or merely as an employee, unprotected? The Supreme Court and this Court have settled the answer. A public employee's speech loses its protection only when it is "itself ordinarily within the scope" of her duties, not whenever it merely relates to or "concerns those duties." *Lane*, 573 U.S. at 240; *see also Flora*, 776 F.3d at 178.

The decision below cannot be squared with that rule. The District Court held that Lisa Tresslar's warning to the Northampton County Bar Association's Family Law Committee, that proposed custody rules would permit judges to coerce parents into settlements while disregarding evidence that children were in danger, was unprotected for the sole reason that her position as Custody Master gave her the knowledge and the standing to speak. That is the very "related to" reasoning

repudiated by the Supreme Court. Left standing, it would drive a wedge into this Court's citizen-speech jurisprudence and resurrect the standard *Garcetti*, *Lane*, and *Flora* abolished, withdrawing First Amendment protection from the public servants whose most valuable speech grows out of what they learn in office.

The error is squarely presented. What began as a four-count suit against five defendants has narrowed to a single First Amendment claim, that Court Administrator J. Jermaine Greene, Sr. and President Judge Craig A. Dally retaliated against Tresslar for that speech by dismantling her job and forcing her resignation. The District Court never decided whether the retaliation occurred or whether her speech caused it. It granted summary judgment on the single threshold ground that Tresslar's remarks were not citizen speech, and it reached that ground only by misapplying the law and resolving disputed facts against her. This Court should reverse.

**Citizen speech.** The dispositive question is not whether Tresslar's speech "related to" her job, but whether speaking to the Committee was itself ordinarily within the scope of her duties. *Garcetti*, *Lane*, and *Flora* make that distinction the heart of the inquiry, and the answer here is no. Tresslar's duties centered on individual cases. She addressed the Committee from outside the court's chain of command to expose asserted judicial misconduct that endangered children, despite a written warning not to criticize a judge. That is citizen speech.

11

**The wrong standard.** The District Court held otherwise only by applying the very "related to" test that *Lane* and *Flora* rejected, and by reasoning that Tresslar's job gave her the access and standing to speak, a rationale also foreclosed by *Javitz v. County of Luzerne*, 940 F.3d 858 (3d Cir. 2019). Worse, the District Court attributed that test to *Flora* itself. The very page it cited for the "related to" standard is the page on which the Third Circuit rejected that standard. The District Court purported to quote *Flora*, yet the quoted words appear nowhere in the opinion. It thus cited *Flora* for a holding *Flora* never issued and language *Flora* does not contain.

**Disputed facts.** Even setting the legal error aside, the scope of Tresslar's duties was genuinely disputed. The sole support for the court's finding that Tresslar acted as a "liaison" to the Committee was the subjective view of an outside party, contradicted by Tresslar and by her supervisor's sworn declaration that he never asked her to act as a liaison. Resolving that dispute against the non-moving party was reversible error under Rule 56.

**Knowledge and causation.** Summary judgment cannot be salvaged on the causation ground the District Court never reached. Greene admitted that he learned Tresslar had spoken at the meeting, testifying that Judge Koury told him she had spoken "at the Family Law against the rules." Judge Dally forwarded Tresslar's own account of the meeting to Greene, and within two weeks of the speech Greene told

12

Tresslar that the day would come when he would be her supervisor. Defendants' knowledge of the protected speech is therefore not in genuine dispute, and the timing of the reprisals that followed presents a jury question on causation.

**The evidentiary ruling.** Reversal does not depend on the order striking Tresslar's declaration. The record the District Court considered, even without the declaration, already creates a genuine dispute over the scope of her duties and requires reversal. But the Court should resolve the strike order either way. The issue is fully briefed, and it will remain live after reversal because the elements the District Court never reached will be litigated on remand, and the scope of the record will matter there. Striking the declaration was an abuse of discretion. It was no sham. Defendants never asked Tresslar at her deposition whether addressing the Committee was part of her duties, so her declaration supplied what the deposition left unexplored rather than contradicting it. The Court should reverse the strike order so that remand proceeds on the complete record.

<u>**STANDARD OF REVIEW**</u>

This Court exercises plenary review over an order granting summary judgment, applying the same standard the District Court. j. *See Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014). Summary judgment is proper only if, viewing the record in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor, "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Whether a public employee spoke as a citizen is a question of law reviewed de novo,

although the scope and content of her job responsibilities is a question of fact. *See*

*Flora*, 776 F.3d at 175.

The District Court's order striking Tresslar's declaration is reviewed for abuse

of discretion. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 198 (3d Cir.

2022).

## ARGUMENT

**I.      The District Court Erred in Granting Summary Judgment on Tresslar's First Amendment Retaliation Claim.**

Tresslar asserted a retaliation claim against J. Jermaine Greene, Sr. and Judge

Dally in violation of the First Amendment under 42 U.S.C. §1983. On appeal,

Tresslar challenges the dismissal of that claim as it concerns her remarks to the

Family Law Committee of the Northampton County Bar Association at its January

12, 2023 meeting, where she opposed proposed revisions to the county's custody

procedures.[1]

---

[1] Tresslar does not pursue on appeal the two other instances of speech she identified below, her October 2022 memorandum to the Family Law Committee and her statements to an investigator for the Pennsylvania Judicial Conduct Board. Nor does she appeal the District Court's separate order striking paragraphs 44 through 64 of her Statement of Additional Material Facts. (Dist. Ct. Dkt. 116, Oct. 27, 2025).

The District Court held that these remarks were made under Tresslar's official duties as Custody Master, were therefore not protected citizen speech, and on that basis granted summary judgment. (Appx 0019-0020). The ruling turned on the first prong of the protected-speech inquiry, whether Tresslar spoke as a citizen. Defendants did not contest, and the District Court did not decide, that the speech addressed a matter of public concern or that the balance of interests under *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), favors protection. (Appx 0019-0020; Appx 1471). Because the court applied the wrong legal standard and resolved genuinely disputed facts against Tresslar, this Court should reverse.

### A. The governing standards.

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane*, 573 U.S. at 231. Those rights are not unlimited, however, for the government, as an employer, retains a "countervailing interest in controlling the operation of its workplaces." *Id.* at 236 (citing *Pickering*, 391 U.S. at 568).

To reconcile these competing interests, the Third Circuit applies a three-step test for a First Amendment retaliation claim. The employee must show (1) that her speech was protected by the First Amendment, and (2) that the speech was a substantial or motivating factor in the alleged retaliatory action. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (citations omitted); *see also Dougherty*, 772 F.3d at 986. If she carries both burdens, the employer may still avoid liability

15

by proving that it would have taken the same action even had the protected speech never occurred. *Id.*

The first step, the only one decided below, itself comprises three questions. Speech is protected when, "in making it, the employee spoke as a citizen," when "the statement involved a matter of public concern," and when "the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418).

Only the first question, whether the employee spoke as a citizen, is in dispute here. The public concern requirement is satisfied and uncontested. Speech that exposes "malfeasance by a government official," or that warns of systemic risks to children and to the integrity of family court decision-making, addresses a matter of public concern. *See Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 429 (3d Cir. 2020). The question is judged by the speech's "content, form, and context . . . as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). And, as noted, Defendants advanced no employer interest capable of outweighing speech of that value under *Pickering*.

With those requirements in view, the decisive question is what it means to speak as a citizen. The Supreme Court held in *Garcetti* that "when public employees

make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The Court declined to advance a framework for identifying such statements, directing instead that "[t]he proper inquiry is a practical one" and warning against reliance on "excessively broad job descriptions." *Id.* at 424-25. Of particular importance here, the High Court made clear that whether speech "concern[s] the subject matter of [the speaker's] employment" is "nondispositive[,]" because "the First Amendment protects some expressions related to the speaker's job." *Id.* at 421 (citations omitted).

*Lane* sharpened that inquiry into the formulation that governs this appeal. "The critical question under *Garcetti*," the *Lane* Court explained, "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, **not whether it merely concerns those duties**." 573 U.S. at 240 (emphasis added). "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment[,]" and "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* at 239-40.

The Supreme Court reaffirmed that standard in *Kennedy v. Bremerton School District*, holding that a coach's on-field prayer was "private speech, not government

speech," because it was not "ordinarily within the scope" of his duties. 597 U.S. 507, 529 (2022) (quoting *Lane*, 573 U.S. at 240). And the Third Circuit applied the same test to set aside a judgment against a public employee in *Flora*, where the district court had dismissed a Chief Public Defender's retaliation claim on the ground that his speech "related to" his official duties. Vacating the dismissal, this Court held that "[i]n thus using the 'related to' standard, the District Court did not apply the correct test under *Garcetti*, as *Lane* has made clear." *Flora*, 776 F.3d at 178-79 (citation omitted). The proper question, the Court explained, is whether the speech "was outside the scope of his ordinary job responsibilities." *Id.* (citation omitted).

It follows that speech is not converted into employee speech merely because the employee learned the underlying information, or gained the standing to speak, through the job. The *Flora* Court noted:

> [we have] never applied the 'owes its existence to' test . . . and for good reason: this nearly all-inclusive standard would eviscerate citizen speech by public employees simply because they learned the information in the course of their employment, which is at odds with the delicate balancing and policy rationales underlying *Garcetti*.

*Flora*, 776 F.3d at 177-78 (quoting *Dougherty*, 772 F.3d at 989).

*Javitz v. County of Luzerne*, 940 F.3d 858 (3d Cir. 2019), illustrates the principle. There, the Third Circuit held that a county Director of Human Resources spoke as a citizen when she reported a crime to the District Attorney, even though her position gave her ready access to that office and an ethics code encouraged the

reporting of wrongdoing. *Id.* at 865-67. Consistent with that reasoning, an employee's "special knowledge" or "experience" is at most "one non-dispositive factor among many[,]" not a basis for forfeiting protection, *Flora*, 776 F.3d at 177 (internal citations omitted), and a formal job description does not answer the question, because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties[.]" *Garcetti*, 547 U.S. at 424-25.

The forum to which an employee speaks bears on the inquiry as well. Speech routed "up the chain of command" as part of an employee's reporting obligations is ordinarily employee speech, *Foraker v. Chaffinch,* 501 F.3d 231, 241-42 (3d Cir. 2007), but communications directed outside that internal hierarchy point the other way. The public defender in *Flora* spoke as a citizen when, after internal channels failed, he turned to outside authorities. *See Flora*, 776 F.3d at 180. The employee in *Dougherty* disclosed misconduct to the press, and the employee in *Javitz* reported to the District Attorney. *See Dougherty*, 772 F.3d at 988; *Javitz*, 940 F.3d at 862. This Court has similarly treated a public employee's statements to officials outside his office, raising concerns about the rights of those he served, as "arguably citizen speech." *De Ritis v. McGarrigle*, 861 F.3d 444, 454, 456 (3d Cir. 2017).

Finally, the citizen-speech question is a mixed one. "[T]he scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional

19

significance of those facts is a question of law." *Flora*, 776 F.3d at 175. The legal question is for the court, reviewed de novo. The factual one is not for the court to resolve against the party opposing the motion. In *Flora*, the Third Circuit held that the District Court erred by making "factual determinations as to the scope of [the plaintiff's] duties" rather than crediting his account. *Id.* at 175-76. That is the command of Rule 56, which forbids a court to weigh evidence, make credibility determinations, or draw inferences against the non-moving party.

### B. Tresslar's remarks to the Family Law Committee were citizen speech.

Measured against these standards, Tresslar's January 12, 2023 remarks were citizen speech. Start with her duties. Tresslar served as the Custody Master for the Northampton County Court of Common Pleas, where her ordinary responsibilities centered on individual cases. She conducted custody conferences, facilitated settlement where possible, and made recommendations to the court in individual matters. (Appx 0792-0794 (Pl. SOMF ¶¶13-15); Appx 0934-0935 (Baratta Decl. ¶¶5, 8)). Advocating policy positions to the Bar Association was not among those duties. (Appx 0802-0803 (Pl. SOMF ¶24)). Her supervisor, Judge Baratta, attested in a sworn declaration, which the District Court did not strike, that he never asked Tresslar to act as a liaison to the Family Law Committee, that he never required her to become a member of the Bar Association or to attend its meetings, and that if he wished to communicate with the Bar Association about the court's rules or

procedures, he would do so himself. (Appx 0938 (Baratta Decl. ¶¶24-25)). No judge or administrator instructed, assigned, or required Tresslar to attend the meeting or to speak. (Appx 0802-0803 (Pl. SOMF ¶ 24)).

The speech itself bore none of the indicia of official duty. On January 12, 2023, Tresslar spoke at the Family Law Committee meeting for more than two hours to an audience of roughly 30 family law attorneys. (Appx 0822 (Pl. SOMF ¶ 83); Appx 0673-0674 (Kruzel Dep. 75-76, 82-83)). The meeting was a gathering of the bar, not a court proceeding or a chambers conference, and Tresslar was not a member of the Committee. (Appx 0019). The substance of her remarks concerned asserted judicial misconduct, the obligation of custody judges to hear evidence, and the need to protect children from danger in custody proceedings. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 1101-1102 (Kingsley Dep. 40-43)). She did not recommend an outcome in any individual case, and she did not complain about her workload or her own working conditions. She criticized systemic custody practices and the integrity of family-court decision-making, matters that affect families, litigants, and children throughout the county. (Appx 0822-0824 (Pl. SOMF ¶85)). Tresslar conveyed no official position of Northampton CCP and made no report to court leadership afterward. (Appx 0938 (Baratta Decl. ¶ 25); Appx 0699 (Koury Dep. 79-80)). To the contrary, she had been warned in writing not to publicly criticize a judge, and she

21

spoke at the meeting notwithstanding that directive and at the risk of reprisal. (Appx 0160-0163; Appx 0821 (Pl. SOMF ¶76)).

These facts place Tresslar's remarks on the citizen side of the line. The question under *Garcetti* and *Lane* is not whether Tresslar drew on knowledge she gained as Custody Master, or whether the subject matter of her speech related to her work, but whether addressing the Bar Association to expose asserted judicial misconduct and oppose a proposed custody rule was "itself ordinarily within the scope" of her duties. *Lane*, 573 U.S. at 240. It was not. (Appx 0938 (Baratta Decl. ¶¶24-25); Appx 0802-0803 (Pl. SOMF ¶24)). The Family Law Committee is a committee of the Northampton County Bar Association, not an arm of Northampton CCP, and Tresslar addressed it from outside the court's chain of command. (Appx 0019; Appx 0938 (Baratta Decl. ¶24)). That she possessed relevant knowledge, or that her position is what brought her before the Committee, does not change the analysis.

In *Javitz*, the employee's report to the District Attorney was citizen speech even though her job supplied the access and an ethics code encouraged it. *See* 940 F.3d at 865-66. *Garcetti*'s own rationale confirms the conclusion. Restricting speech made under official duties is permissible because it "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421-22 (citation omitted). Northampton CCP commissioned

22

nothing here. On the contrary, Tresslar had been warned in writing not to criticize a judge publicly, and she spoke anyway. (Appx 0160-0163; Appx 0821 (Pl. SOMF ¶76)). Discipline for speech the employer tried to prevent is not the employer's control over its own commissioned product. And even if attending Family Law Committee meetings had been among Tresslar's duties, the speech she delivered at this one was not.

Nor is it an answer that designing and implementing administrative procedures for the Custody Division was among Tresslar's responsibilities. That was internal work, and when the court's procedures needed to be communicated to the Bar Association or its Family Law Committee, the President Judge did so himself. (Appx 0938 (Baratta Decl. ¶¶24-25)). Tresslar's remarks to the Committee were not the performance of her procedures-related duty. Almost all of them concerned asserted judicial misconduct. She described judges pressuring parties into custody settlements while refusing to read the case summaries and expert reports that documented danger to children. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 1101-1102 (Kingsley Dep. 39-43)). Nothing in the record suggests that exposing that conduct was work Tresslar was employed to perform. (Appx 0822-0824 (Pl. SOMF ¶85); Appx 0160-0163). Like the speech in *Flora*, *Dougherty*, and *Javitz*, Tresslar's remarks were delivered outside her chain of command, addressed a matter of public concern, and were not among the tasks she was employed to perform.

**C. The decision below rests on a misreading of *Flora* that inverts the holding of the case.**

The District Court did not merely reach the wrong result. It reached that result by applying the precise standard the Third Circuit has disavowed, and then attributed that standard to the decision disavowing it. The District Court held Tresslar's remarks unprotected because (1) they were "intimately related to the employee's job duties[,]" (2) she "would not have had the opportunity to attend but for her role as Custody Master[,]" and (3) "[a]bsent her employment with County Court, she would have lacked both the access and authority" to speak. (Appx 0019). That is the "related to" test. And it is the one test the governing cases hold a court may not use. The question is not whether speech "relates to," "concerns," or "owes its existence to" the job, but whether the speech was "itself ordinarily within the scope" of the employee's duties. *Lane*, 573 U.S. at 240; *Flora*, 776 F.3d at 178.

The error was not only analytical. It was a misreading of authority. To support its conclusion, the District Court cited *Flora* itself, 776 F.3d at 179, for the proposition that "speech was unprotected where it was 'intimately related to the employee's job duties.'" (Appx 0019). But *Flora* holds the opposite, and it does so on the very page the District Court cited. Page 179 is where the Third Circuit explains that "[i]n thus using the 'related to' standard, the District Court did not apply the correct test under *Garcetti*, as *Lane* has made clear[,]" and that the proper question is whether the speech was "outside the scope of [the employee's] ordinary

24

job responsibilities." 776 F.3d at 178-79 (quoting *Lane*, 573 U.S. at 238). *Flora* did not hold any speech unprotected. It *vacated* the dismissal of a Chief Public Defender's retaliation claim, holding that his complaint contained "sufficient allegations that his ordinary job duties did not include" the speech at issue. *Id.* at 180-81. And the phrase the District Court placed in quotation marks, "intimately related to the employee's job duties," appears nowhere in *Flora*. The District Court thus rested its central holding on a proposition *Flora* rejects, expressed in words *Flora* never used, citing the page on which *Flora* says the contrary.

And *Flora*'s facts show how far the District Court strayed. The speech held protectable there could hardly have been more connected to the speaker's job. *See Flora*, 776 F.3d at 180. The Chief Public Defender sued the county over funding for his own office, and he reported the county's failure to complete court-ordered expungements of juvenile records. *Id.* He was responsible for that office's representation of its clients, and he learned of both problems in the course of his duties. *Id.* The Third Circuit nonetheless held that his speech was "not part of the work he was paid to perform on an ordinary basis." *Id.* Statements that "bore some relation to his job duties and may have, indirectly, benefitted his clients" still did "not bring the speech within the realm of his ordinary job duties." *Id.* at 180. If a public defender's lawsuit over funding for his own office was citizen speech, then a custody master's warning to a bar committee she was never assigned to address, that

sitting judges were endangering children and that the proposed guidelines would let that conduct continue, was citizen speech as well. Tresslar's remarks were less connected to her duties than the speech *Flora* protected. The District Court thus misread *Flora* twice over. It inverted *Flora*'s holding, and it condemned speech more remote from the job than the speech *Flora* protected. A judgment that depends on the precedent refuting it cannot stand.

Nor can the judgment stand on the mode and manner rationale the District Court borrowed from *De Ritis*. The District Court reasoned that employees do not speak as citizens when the mode and manner of their speech are possible "only as an ordinary corollary" to their employment, and that Tresslar could not have addressed the Committee absent her job. (Appx 0019). *De Ritis* does not carry that weight. The assistant public defender there complained that he had been transferred for taking too many cases to trial. *De Ritis*, 861 F.3d at 449-50. He made that complaint in two settings. He made it in courtrooms, to judges and other lawyers, while he was there representing clients. *Id.* at 450, 453-54. And he made it away from the courthouse, to other attorneys and to two county officials. *Id.* at 450-51, 453. The Third Circuit treated the two settings differently. The courtroom statements were employee speech because they were delivered in the very performance of his duties. *Id.* at 453-54. He could speak to counsel and the court in those courtrooms only because he was appearing there as a public defender. *Id.* at 454. But when the

26

same lawyer voiced the same complaint outside the courthouse and to officials outside his office, this Court held that those statements were "arguably citizen speech" because they were not part of the work he was paid to perform on an ordinary basis. *Id.* at 454 (quoting *Flora*, 776 F.3d at 180). The Court added that citizens may bring lawsuits based on information learned through their jobs and may report alleged workplace misconduct to government officials. *Id.* The line *De Ritis* draws is between speech transmitted through the channels of the job itself and speech delivered outside them. *See id.* at 453-54. Tresslar's remarks, delivered at a bar committee meeting she was never assigned to attend, fall on the citizen side of that line.

And that line decides this case. Tresslar was not performing her job when she spoke. She conducted no conference, settled no case, and made no recommendation to any judge. She addressed a committee of the county bar association, an audience outside the channels of her employment, like the out-of-court statements this Court deemed "arguably citizen speech" in *De Ritis*. 861 F.3d at 454. She spoke at that organization's invitation, without any directive from the court, and despite a written warning not to criticize a judge. An invitation from the Bar Association is not an assignment from the employer. *See Lane*, 573 U.S. at 238. Nor was addressing the Bar Association part of the work Tresslar was "paid to perform on an ordinary basis." *Flora*, 776 F.3d at 180. Her paid work was conducting conferences, facilitating

settlement, and making recommendations in individual cases, and no one at the court ever required her to speak to the Committee. (Appx 0802-0803 (Pl. SOMF ¶24); Appx 0938 (Baratta Decl. ¶¶24-25)).

The District Court's citizen-speech ruling therefore fails at every step. It rested on a proposition that *Flora* rejects at the very page the court cited, and it condemned speech more remote from the job than the speech *Flora* protected. 776 F.3d at 179-80. It stretched *De Ritis*'s mode and manner rationale past the courtroom setting that decision addressed. 861 F.3d at 453-54. And it resolved the scope of Tresslar's duties against her on a record containing no evidence that speaking to the Family Law Committee was among them. (Appx 0802-0803 (Pl. SOMF ¶24); Appx 0938 (Baratta Decl. ¶¶24-25)). Under *Lane*, the question is whether the speech itself was ordinarily within the scope of her duties, not whether it concerned them. 573 U.S. at 240. On this record, Tresslar spoke as a citizen. At a minimum, the scope of her job duties is a question of fact that could not be resolved against her at summary judgment. *Flora*, 776 F.3d at 175.

The judgment should be reversed.

**D.    The District Court's rule that job-conferred access defeats First Amendment protection will lead to untenable results.**

The rule the District Court applied cannot be the law for another reason. It proves far too much. If a public employee speaks only as an employee whenever her position supplied the invitation, the audience, the access, or the knowledge that made

the speech possible, then the First Amendment would desert public employees precisely where their voices matter most, when they speak about what they have learned in public service. *Lane* forecloses that result, and a few illustrations show why.

Start with the illustration Tresslar's counsel gave the District Court at oral argument, which its opinion never answered. (Appx 1471). A sitting judge is invited to speak at a continuing legal education ("CLE") seminar. She is asked only because she is a judge. But for her office, the bar would have no reason to seek her views, and her remarks will draw on all she has learned on the bench. On the District Court's reasoning, her speech is unprotected, because she had neither the "access" nor the "authority" to give it apart from her job. That cannot be the law. A judge who speaks at a CLE, publishes a law-review article, or testifies before a legislature about the law she administers speaks as a citizen on a matter of public concern, however plain it may be that her office is the reason she was asked.

The point sharpens when the stakes do. For example, a state bridge inspector tells a public meeting that the span he was assigned to inspect is unsafe and that his agency is ignoring the danger. He has the data, and is believed, only because of his job. He would have neither the access nor the standing to sound the alarm but for his position. Under the District Court's test, his warning is unprotected employee speech. That cannot be right. Speech that warns the public of a danger learned on

the job is the paradigm of protected citizen speech, which is exactly what Tresslar's warning about risks to children was.

The decided cases confirm it. The teacher in *Pickering* wrote to a newspaper criticizing his school board's spending, drawing on what he knew as a teacher. His letter was protected, and *Pickering* remains the foundation of this doctrine. *See* 391 U.S. at 568. The witness in *Lane* testified about corruption he learned of only through his public job. *See* 573 U.S. at 240. The human resources director in *Javitz* reported a crime to the District Attorney using access her position supplied. *See* 940 F.3d at 862, 866. And the public defender in *Flora* went outside his office to report failures he met in his work. *See* 776 F.3d at 180. Each spoke as a citizen. A test under which job-conferred access and knowledge defeat protection would have decided every one of those cases the other way. That is reason enough to reject it.

The principle the cases share is the one *Lane* announced. Speech does not forfeit its constitutional status because the speaker acquired the information "by virtue of his public employment," or because the job is what brought her to the podium. *Lane*, 573 U.S. at 240. Tresslar's remarks are no different. That her work as Custody Master gave her something worth saying, and an audience willing to hear it, is a measure of the speech's value, not a reason to deny it First Amendment protection.

**E. Independently, the District Court resolved genuinely disputed facts against Tresslar.**

The scope of Tresslar's duties was genuinely disputed, and that alone made summary judgment improper. Whether she served as a "liaison" to the Family Law Committee, and whether attending and speaking at its meetings fell within her responsibilities, are precisely the "scope and content" questions that *Flora* holds are questions of fact. 776 F.3d at 175.

The only support in the record for the "liaison" characterization is the subjective perception of the Committee's president, an outside party. But even that perception was equivocal. President Kruzel testified that Tresslar served "kind of as a liaison" between the judges and the practitioners, and that Tresslar "certainly . . . could attend if she wanted to." (Appx 0682 (Kruzel Dep. 154); Appx 0677-0678 (Kruzel Dep. 133-34)). A hedged impression from outside the court, describing attendance as optional, is not evidence that attendance was a duty. No supervisor or coworker testified that addressing the Bar Association or its Family Law Committee was part of Tresslar's ordinary duties, and Judge Baratta's declaration, which the District Court did not strike and therefore considered, establishes the opposite. He never asked Tresslar to act as a liaison to the Committee, and when the court wished to communicate with the Bar Association about its custody rules and procedures, the President Judge did so himself. (Appx 0938 (Baratta Decl. ¶¶24-25)).

31

The District Court nonetheless resolved that dispute in Defendants' favor, and it drew a further inference against Tresslar from the Committee president's view that Committee members might speak "more candid[ly]" in her absence. (Appx 0020; Appx 0677-0678 (Kruzel Dep. 133-34)). By making independent findings about the reach of Tresslar's duties and weighing the evidence against her, the court did precisely what *Flora* and Rule 56 forbid. 776 F.3d at 175-76; *Anderson*, 477 U.S. at 255. Because Tresslar's remarks to the Family Law Committee were citizen speech, and because the District Court reached the contrary result only by misapplying the law and resolving disputed facts against her, the judgment cannot stand.

## II. The District Court Abused Its Discretion in Striking Tresslar's Declaration.

The Court can and should reverse on the record the District Court considered, for the reasons given above. That record, even without Tresslar's stricken declaration, was enough to create a genuine dispute over whether addressing the Family Law Committee was within her ordinary duties, and to require reversal without restoring the stricken declaration.

The strike order nonetheless warrants decision in either event. If the Court concludes that the considered record is not enough, the order cannot be ignored, because the declaration is where Tresslar herself states, under oath, that addressing the Committee was not part of her job. And even if the Court reverses on the considered record, the strike order will remain in force and will control the scope of

32

the record on remand, where the parties will litigate the elements the District Court never reached, including whether Tresslar suffered an adverse employment action and whether Defendants would have taken the same action absent her speech.

The issue is fully briefed, and resolving it now will spare the parties and the District Court any second appeal over the same order. Indeed, the declaration states that no judge or administrator ever asked Tresslar to attend a Family Law Committee meeting or to provide or obtain feedback from the Committee, and that she attended fewer than five Committee meetings in nine years. (Appx 0921 (Tresslar Decl. ¶1)). It describes the objectives and conference procedures Judge Baratta set for her when he hired her. (Appx 0921-0925 (Tresslar Decl. ¶¶2-7)). It recounts the directives court leadership gave her about her case summaries and recommendations. (Appx 0925 (Tresslar Decl. ¶¶8-10)). And it states that Judge Koury had told her that identifying judicial misconduct was not part of her job, and that she spoke at the January 12, 2023 meeting believing she did so as a private citizen on a matter of public concern. (Appx 0929-0930 (Tresslar Decl. ¶¶21-23)). Its remaining paragraphs bear on the elements the District Court never reached. They set out her sworn account of the stripped duties and intolerable working conditions that culminated in her constructive discharge. (Appx 0930-0932 (Tresslar Decl. ¶¶24-27, 30)), and they rebut the misconduct allegations Defendants offered to justify their actions. (Appx 0921-0922, 0928-0929 (Tresslar Decl. ¶¶2, 14-18)).

33

Striking Tresslar's declaration was an abuse of discretion. If the Court reverses on Argument I, it should also reverse the strike order so that proceedings on remand go forward on the complete record. If it does not, it should hold that the strike order was an abuse of discretion, vacate the judgment, and remand so that the District Court may decide summary judgment on the complete record.

## A. The declaration is not a sham affidavit.

Defendants principally argued that Tresslar's declaration was a "sham" that contradicted her deposition. But the District Court did not adopt that theory. Its order rests only on the grounds addressed in Section II.B below, and it nowhere finds a contradiction between the declaration and Tresslar's deposition. (Dist. Ct. Dkt. 117; Appx 0004). The sham argument is therefore available to Defendants, if at all, only as an alternative ground for affirmance.

But even that argument fails on its own terms. The sham affidavit doctrine is narrow. It bars a party from manufacturing a fact dispute to defeat summary judgment by submitting an affidavit that contradicts her own prior sworn testimony without a plausible explanation for the conflict. *See SodexoMAGIC, LLC*, 24 F.4th at 209. Because summary judgment is not an occasion for credibility assessments, the rule permits striking only genuinely contradictory statements, and courts generally refuse to strike later statements supported by independent record evidence. *Id.* at 210.

There was no such contradiction here. Tresslar's deposition was the first taken in the litigation, and Defendants asked her few questions. In particular, they never asked her whether attending or speaking at Family Law Committee meetings was part of her duties. (Appx 0547-0600 (Tresslar Dep.)). The declaration did not contradict that testimony. It supplied what the deposition never explored. On the dispositive point, Tresslar's declaration clarified that she was never assigned a formal liaison role to the Committee, was never instructed to attend or to report back, and that casual, case-related conversations with attorneys in the course of her work did not convert her January 12, 2023 remarks into official-duty speech. (Appx 0921 (Tresslar Decl. ¶1)). Clarifying a subject Defendants chose not to probe is permissible supplementation, not a sham.

The remaining "conflicts" Defendants identified, concerning the timing of events, the locus of disciplinary authority, and the like, are reconcilable on their face and, at most, present jury questions.

Because Defendants identified no clear, irreconcilable contradiction on a material point, the doctrine did not apply, and striking the declaration as a sham was an abuse of discretion.

**B.    The declaration satisfies Rule 56(c)(4), and wholesale striking was improper in any event.**

The District Court's stated grounds, that the declaration "lacks legal foundation," presents "voluminous examples of inadmissible hearsay," and

"contains information that is immaterial" to the claim (Dist. Ct. Dkt. 117; Appx 0004), do not support striking even part of the declaration, much less all of it. Rule 56(c)(4) requires only that a declaration be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify. *See* Fed. R. Civ. P. 56(c)(4). Tresslar's declaration meets that standard. She describes what she personally observed in her role, including how the custody office operated before and after her speech, what court leadership said to her and directed her to do, when and where she spoke, and the changes to her responsibilities that followed. (Appx 0921-0933 (Tresslar Decl.)). Those matters are within her personal knowledge, and she is competent to testify to them at trial.

The hearsay objection misapprehends the declaration's purpose. Where Tresslar recounts what attorneys and counselors told her, the statements are not offered for their truth but to show that the concerns existed, were communicated to her, and shaped the content and context of her speech, classic non-hearsay uses (effect on the listener, notice, and state of mind) central to the First Amendment inquiry. *See* Fed. R. Evid. 801(c). Statements by Defendants or their agents on personnel and operational matters are admissible as opposing-party statements. *See* Fed. R. Evid. 801(d)(2). And Rule 56 does not require that evidence already be in admissible form. It requires only that the fact be capable of presentation "in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Even if some portion of the declaration were objectionable, the remedy was to disregard that portion, not to strike the declaration whole. The order concedes as much in its own words. It found that "much of" the declaration was deficient, yet it struck all of it. (Dist. Ct. Dkt. 117; Appx 0004). What the order says of much of the declaration it necessarily does not say of the rest. By striking the entire declaration, the District Court swept away admissible, material, first-person evidence on the dispositive question of Tresslar's duties along with anything it thought deficient. That was an abuse of discretion.

## **CONCLUSION**

For all these reasons, the judgment of the District Court should be reversed, the order striking Tresslar's declaration should also be reversed, and the case should be remanded for further proceedings on the complete record. In the alternative, if the Court does not reverse on the record the District Court considered, it should hold that striking Tresslar's declaration was an abuse of discretion, vacate the judgment, and remand so that the District Court may decide summary judgment on the complete record.

Respectfully submitted,

/s/ Brian C. Farrell
Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515

Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

July 27, 2026

# CERTIFICATION OF COMPLIANCE WITH WORD LIMITS

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,980 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in font size 14, font style Times New Roman.

<div style="text-align:right">

/s/ Brian C. Farrell
Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

</div>

July 27, 2026

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I hereby certify that I am a member in good standing of the bar of the United

States Court of Appeals for the Third Circuit.

<div align="right">

<u>/s/ Brian C. Farrell</u>
Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

</div>

July 27, 2026

## CERTIFICATION OF TEXT OF E-BRIEF

I certify that the text of the E-Brief and the text of the hard copies of Appellant's brief are identical.

## CERTIFICATION OF VIRUS CHECK

I certify that a virus check was performed on the PDF file of Appellant's brief. The virus software used was Bitdefender.

<div style="margin-left:auto; width:50%;">

/s/ Brian C. Farrell
Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

</div>

July 27, 2026

# CERTIFICATE OF SERVICE

I, Brian C. Farrell, counsel for Appellant Lisa Tresslar and a member of the Bar of this Court, certify that, on July 27, 2026, a copy of the Opening Brief of Appellant Lisa Tresslar and all accompanying appendices were filed electronically through the appellate CM/ECF system with the Clerk of Court. I further certify that all parties required to be served have been served.

<div style="text-align: right">

/s/ Brian C. Farrell
Brian C. Farrell, Esquire
William Rieser, Esquire
Sidney L. Gold, Esquire
The Gold Law Firm, P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
Counsel for Appellant Lisa Tresslar

</div>

July 27, 2026

**LISA L. TRESSLAR,**
Appellant

v.

**J. JERMAINE GREENE, SR., AND
CRAIG A. DALLY,**
Appellees
No. 26-1367


**JOINT APPENDIX – VOLUME I
<u>TABLE OF CONTENTS</u>**

1.  NOTICE OF APPEAL ...................................................................APPX 0001

2.  ORDER GRANTING DEFENDANTS' MOTION TO STRIKE
    PLAINTIFF'S DECLARATION (ECF 107) AND STRIKING
    PLAINTIFF'S DECLARATION (ECF 100-4) ..............................APPX 0004

3.  ORDER GRANTING DEFENDANTS' MOTION FOR
    SUMMARY JUDGMENT (ECF 95) AND DISMISSING ALL
    REMAINING CLAIMS WITH PREJUDICE ...............................APPX 0005

4.  MEMORANDUM OPINION GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT (ECF 95)....................APPX 0006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LISA L. TRESSLAR : 
*Plaintiff,* : 
 : 
    v. : Civil No. 5:24-cv-01435-JMG
 : 
J. JERMAINE GREENE, SR., et al., : 
*Defendants.* : 

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Lisa L. Tresslar, through counsel, pursuant to 28 U.S.C. §1291 and Rule 3 of the Federal Rules of Appellate Procedure, hereby appeals to the United States Court of Appeals for the Third Circuit from the following Orders entered by the Honorable John M. Gallagher, United States District Court Judge:

1.   The Order dated October 27, 2025 (ECF No. 116), granting Defendants' Motion to Strike (ECF No. 105) and striking paragraphs 44 through 64 of Plaintiff's Statement of Additional Material Facts (ECF No. 100-2);

2.   The Order dated October 31, 2025 (ECF No. 117), granting Defendants' Motion to Strike Plaintiff's Declaration (ECF No. 107) and striking Plaintiff's Declaration (ECF No. 100-4); and

3.   The Order dated February 2, 2026 (ECF No. 129), and accompanying Memorandum Opinion (ECF No. 128), granting Defendants' Motion for Summary Judgment (ECF No. 95) and dismissing all remaining claims asserted in this action with prejudice.

**THE GOLD LAW FIRM, P.C.**

By: /s/ Sidney L. Gold
     Sidney L. Gold, Esquire
     1835 Market Street, Suite 515

1

**Appx 0001**

Philadelphia, PA 19103
(215) 569-1999
sgold@discrimlaw.net
Attorney for Plaintiff Lisa L. Tresslar

Date: February 19, 2026

2

**Appx 0002**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this 19th day of February, 2026, I caused a true and exact copy of the foregoing PLAINTIFF'S NOTICE OF APPEAL to be filed electronically and served on all parties and counsel of record. Notice and copies of this filing will be sent by email to all parties through the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:   /s/ Sidney L. Gold
        Sidney L. Gold, Esquire

**Appx 0003**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LISA L. TRESSLAR** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:24-cv-01435-JMG |
| | : | |
| **J. JERMAINE GREENE, SR.,** *et al.*, | : | |
| Defendants. | : | |

### ORDER

**AND NOW**, this  31ˢᵗ  day of October, 2025, upon consideration of Defendant's

Motion to Strike Plaintiff's Declaration (ECF No. 107) and Plaintiff's Response in Opposition

(ECF No. 115), **IT IS HEREBY ORDERED** that Defendant's Motion (ECF No. 107) is

**GRANTED** and Plaintiff's Declaration (ECF No. 100-4) is **STRICKEN**.[1]

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[1] 56(c)(4) of the Federal Rules of Civil Procedure provides that a declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. Declarations must attest to facts, not opinions and conclusions. *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985). As Defendants point out, much of Plaintiff's Declaration lacks legal foundation, presents voluminous examples of inadmissible hearsay, and contains information that is immaterial to her First Amendment Retaliation claim. For those reasons, Plaintiff's Declaration (ECF No. 100-4) is **STRICKEN**.

**Appx 0004**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA L. TRESSLAR                           :
        Plaintiff,                     :
                                       :
        v.                             :    Civil No. 5:24-cv-01435-JMG
                                       :
J. JERMAINE GREENE, SR., *et al.*,         :
        Defendants.                    :

## ORDER

**AND NOW**, this 2nd day of February, 2026, upon consideration of Defendants' Motion for Summary Judgment (ECF No. 95), Defendants' Appendix (ECF No. 96), Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 100), Plaintiff's Appendix (ECF No. 101), Defendants' Reply Brief in Support of Their Motion for Summary Judgment (ECF No. 109), Plaintiff's Sur-Reply in Further Opposition to Defendants' Motion for Summary Judgment (ECF No. 113), Plaintiff's Letter Dated December 15, 2025 (ECF No. 123), Defendants' Letter Dated December 29, 2025 (ECF No. 126), and the arguments set forth by the Parties during Oral Argument on December 17, 2025,

**IT IS HEREBY ORDERED** that Defendants' Motion (ECF No. 95) is **GRANTED** and all claims asserted in this action are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Clerk of Court is **DIRECTED** to mark this case **CLOSED**.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

**Appx 0005**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **LISA L. TRESSLAR** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:24-cv-01435-JMG |
| | : | |
| **J. JERMAINE GREENE, SR.,** *et al.*, | : | |
| Defendants. | : | |

---

**MEMORANDUM OPINION**

GALLAGHER, J                                                              February 2, 2026

## I.    INTRODUCTION

Plaintiff Lisa Tresslar ("Plaintiff" or "Tresslar"), former full-time Custody Master for the Northampton County Court of Common Pleas (the "County Court") claims she was constructively terminated from her employment in retaliation for concerns she expressed over the County Court's Revised Custody Guidelines (the "Revised Guidelines") in violation of her First Amendment rights. Now, in the face of Defendants' Motion for Summary Judgment, Plaintiff must point to evidence from which a jury could agree with her. She has not done so.

Notwithstanding the benefit of inferences drawn in her favor, Plaintiff has failed to demonstrate a genuine dispute of material fact as to her claims against Defendants. Therefore, Defendants' Motion is granted and Plaintiff's remaining claims are dismissed.

## II.    FACTUAL BACKGROUND

Plaintiff is an attorney who served as Custody Master for the County Court from 2014 until 2023. *See* Amend. Compl. ¶¶ 15-16, 18. Plaintiff was hired as the County Court's first full-time Child Custody Master. *Id.* at ¶ 16. Plaintiff's responsibilities included facilitating conferences between litigants, preparing case summaries, and designing and implementing administrative

**Appx 0006**

procedures for the County Court. *Id.*

In late 2021, the County Court began the process of changing its Custody Guidelines. Plaintiff alleges that the District Court Administrator, Jermaine Greene ("Defendant Greene") informed Judge Stephen G. Baratta ("Judge Baratta"), the then-Administrative Judge of the Custody Division, that the County Court had received Revised Guidelines to the County Court's Custody Provision from the Family Law Committee of the Northampton Bar Association (the "FLC"). *Id* at ¶ 27. The FLC later denied this and instead, stated that the Revised Guidelines had been sent to the FLC by someone at the County Court. *Id.* at ¶ 28.

In March 2022, Plaintiff alleges that Judge Jennifer Sletvold ("Judge Sletvold"), Judge Paula Roscioli ("Judge Roscioli"), and Defendant Greene proposed the adoption of new administrative procedures for the County Court's Child Custody Division. *Id.* at ¶ 31. Plaintiff opposed the Revised Guidelines, claiming that the changes targeted Plaintiff and significantly diminished her role in the child custody process by restricting judges' access to her and imposing overly burdensome restrictions on her ability to settle custody cases and assist judges in conducting their custody hearings and trials. *Id.* at ¶ 31.

In June 2022, Plaintiff sent a memorandum opposing the Revised Guidelines to Judge John M. Morganelli ("Judge Morganelli"), Administrative Judge of the Custody Division. *Id.* at ¶ 35. Plaintiff allegedly told Judge Morganelli that she had "grave concerns" about Judges Sletvold and Roscioli's motives in requesting the Revised Guidelines. *Id.* at ¶ 33. While Judge Morganelli did not involve Plaintiff in the collective discussions concerning the Revised Guidelines, he advised her that she should focus on the mechanical issues that would need to be addressed in the event that the President Judge decided to implement the Revised Guidelines. *Id.* at ¶ 34.

In July 2022, a Judicial Conduct Board ("JCB") investigator interviewed Plaintiff regarding a different complaint lodged against Judge Sletvold. The JCB investigator approached

2

**Appx 0007**

Plaintiff in her workplace because the complainant had named Plaintiff among several individuals who might have relevant information. During that interview, Plaintiff reiterated many of the same concerns about the Revised Guidelines and judicial misconduct that she had raised before.

Then, in January 2023, Plaintiff attended an FLC meeting (the "FLC Meeting") to discuss the Revised Guidelines, including her concerns and criticisms of them. *Id.* at ¶ 36. Plaintiff also noted to the FLC her concerns regarding certain judges. *Id.* at ¶ 37-40. Specifically, Plaintiff informed the FLC that certain judges had attempted to coerce litigants into entering particular agreements, and that the Revised Guidelines would allow and even encourage such judges to place undue pressure on litigants to enter similar agreements in the future. *Id.* at ¶ 39-40. Relatedly, she urged the FLC to consider that the Revised Guidelines would permit certain judges to violate their duties to hear the evidence presented to them and make decisions necessary to protect children. *Id.* at ¶ 40. Plaintiff alleges that all named Defendants were aware of her comments to the FLC. *Id.* at ¶ 41. Defendants, however, dispute that they knew of Plaintiff's comments at the FLC Meeting.

In May 2023, Craig A. Dally ("Judge Dally" or "Defendant Dally") became President Judge of the County Court. *Id.* at ¶ 48. Two months later, on July 6, 2023, Defendant Dally promulgated the new Custody Division procedures, adopting the Revised Guidelines discussed above. *Id.* at ¶ 49. A week later, on July 14, 2023, Plaintiff alleges that she sent Judge Dally an email to reassert her opposition to the new procedures and detail the detrimental effect the new procedures would have on the County Court and Plaintiff's ability to perform her job. *Id.* at ¶ 50.

Plaintiff's Amended Complaint pleads a series of allegedly retaliatory changes to her role following the email she sent to Judge Dally. First, she alleges that Judge Dally shifted his supervisory power over Plaintiff to Defendant Greene. *Id.* at ¶ 53. Next, she maintains that Defendant Greene subordinated Plaintiff to work under a part-time custody master, Roseann Joseph ("Joseph"). *Id.* at ¶ 54. In addition, Plaintiff represents that Defendant Greene allegedly

reorganized Plaintiff's caseload, assigning her a greater number of cases involving unrepresented litigants, while assigning Joseph a greater percentage of cases involving attorneys. *Id.* at ¶¶ 55-56. Lastly, Plaintiff alleges that she was restricted in her ability to manage cases and facilitate settlement between litigants.[1] *Id.* at ¶ 57.

Plaintiff alleges that this changed on October 11, 2023, when Judges Dally and Morganelli removed Defendant Greene's authority over the Custody Division and restored Plaintiff's job to the way it was before Defendant Greene had taken over. *Id.* at ¶ 59. However, Judge Dally allegedly reversed this decision the following day after Defendant Greene registered a complaint with the Administrative Office of Pennsylvania Courts. *Id.* at ¶ 61. Two days later, on October 14, 2023, Plaintiff resigned from her position as Custody Master. *Id.* at ¶ 63.

## III.   PROCEDURAL HISTORY

Plaintiff initiated this lawsuit in April 2024. *See* Complaint, at ECF No. 1. On June 27, 2024, Plaintiff filed an Amended Complaint alleging (1) sex discrimination in violation of Title VII (Count I); (2) retaliation in violation of Title VII (Count II); (3) First Amendment Retaliation (Count III); and (4) a violation of the Equal Protection Clause (Count IV). *See* Amend. Compl. Defendants moved to dismiss each of Plaintiff's claims. On October 18, 2024, the Court dismissed Plaintiff's sex discrimination and Equal Protection claims, as well as all claims against Judges Sletvold and Roscioli, leaving active a Title VII Retaliation claim against the County Court and a First Amendment Retaliation claim against Defendants Greene and Dally. *See* Order, at ECF No. 40. On July 15, 2025, Plaintiff voluntarily dismissed her Title VII Retaliation claim. *See* ECF No. 77. Accordingly, this case proceeds on Plaintiff's remaining claims for First

---

[1] Plaintiff states that while Defendant Greene allowed Joseph to take unlimited time to conduct her conferences and settle her cases, Defendant Greene directed her to halt each of her conferences at the end of its allotted one-hour time slot, whether the case had settled or not.

Amendment retaliation against Defendants Greene and Dally.

### IV.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that a judge shall "grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Essentially, the Court must analyze "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). At this stage of litigation, all facts presented are viewed in the light most favorable to the nonmoving party, and the moving party "has the initial burden of demonstrating that *no* genuine issue of material fact exists." *Daniels v. City of Pittsburgh*, 2023 WL 2707178, at \*2 (3d Cir. Mar. 30, 2023); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (emphasis added).

To survive a properly supported motion for summary judgment, the nonmoving party must present affirmative evidence of specific facts in the record to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S at 256-57; *Berkeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005)) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."). It is not enough to "deny the allegations in the moving party's pleadings; instead [Plaintiff] must show where in the record there exists a *genuine* dispute over a material fact." *Doe v. Abington Friends School*, 480

5

**Appx 0010**

F.3d 252, 256 (3d Cir. 2007) (citations omitted) (emphasis added). In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture..." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016). In addition, "conclusory, self-serving affidavits are insufficient to withstand . . . summary judgment." *Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012). It is not the role of the Court to weigh the evidence provided by the Parties and make a determination as to which facts are true. Rather, the Court is instructed "to determine if there is a genuine issue for trial." *Josey,* 996 F.2d at 637.

V.    ANALYSIS[2]

Plaintiff's remaining claim is that Defendants retaliated against her for her exercise of her First Amendment rights. She seeks recourse under 42 U.S.C. § 1983, which authorizes suits against state and local government actors for constitutional violations. It is well established that public employees possess a constitutional right to express themselves on matters of public concern, free from the fear of retaliation. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 142 (1983) ("[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutional protected interest in freedom of expression."); *Pickering v. Board of Educ. of Township High School*, 391 U.S. 563, 574 (1968) ("Statements by public officials on matters of

---

[2] Plaintiff's reliance on the law-of-the-case doctrine is misplaced. The Court's earlier ruling on the Motion to Dismiss addressed only the sufficiency of the pleadings, accepting the allegations as true for that limited procedural purpose. That determination does not constitute a factual finding, nor does it preclude the Defendants from challenging those allegations at this stage, where the governing standard is different. To the extent Plaintiff contends that the Court's acceptance of an allegation as plausible at the Rule 12(b)(6) stage forecloses Defendants from disputing that allegation on a developed evidentiary record, the argument is a non-starter.

If Plaintiff is seriously advancing the position that a Rule 12(b)(6) ruling bars Defendants from contesting the facts underlying that allegation, it reflects a misunderstanding of the distinct roles of the pleadings and evidentiary record. At this stage, the Court is required to evaluate actual evidence, not assumed facts, and nothing in the prior ruling limits Defendants' ability to present such evidence or the Court's ability to consider it.

public concern must be accorded First Amendment protection"). That right, however, is not absolute, and must be balanced against the interest of the State in "promoting the efficiency of the public services it performs through its employees." *See Connick*, 461 U.S. at 142 (quoting *Pickering*, 391 U.S. at 568).

The balance between the First Amendment and the government's efficiency interest is analyzed through a three-step framework, whereby a public employee must show the following. First, the employee must show that the speech in question is protected by the First Amendment. *See Dooley v. City of Philadelphia*, 153 F.Supp.2d 628, 640 (E.D. Pa. 2001). If their speech is protected, the employee must then establish that the speech was a substantial or motivating factor in the alleged retaliatory action. *Id.* If both are established, the burden shifts to the employer, who may establish that it would have taken the adverse employment action regardless of whether the employee had engaged in the protected conduct. *See id.*

Drawing all inferences in Plaintiff's favor, the Court will review the episodes of speech made by Plaintiff. The Court notes that, although the Plaintiff initially identified additional instances of speech, she subsequently narrowed the episodes of speech at issue by letter submitted to the Court on December 15, 2025, and again during Oral Argument held on December 17, 2025. *See* Letter, ECF No. 123. Accordingly, the Court considers only three instances of speech identified by Plaintiff as alleged predicates to Defendants' retaliation.

For a public employee's speech to be protected under the First Amendment, the public employee must show that (1) in making the speech she spoke as a private citizen, and (b) the speech involved a matter of public concern. *See Archie v. City of Philadelphia*, 2025 WL 220024, at *10 (E.D. Pa. Jan. 16, 2025) (citing *Gilles v. Davis*, 427 F.3d 197, 212 (3d Cir. 2005)). Public employees who make statements pursuant to their official duties do not speak as citizens for First Amendment purposes. *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 864 (3d Cir. 2019). Conversely, a

7

**Appx 0012**

public employee that does not speak pursuant to official duties instead speaks as a private citizen. *See Daugherty v. Sch. Dist. Of Philadelphia*, 772 F.3d 979, 988 (3d Cir. 2014) (holding that the plaintiff, a school district administrator, was acting as a private citizen when he reported alleged misconduct, since the disclosure fell outside his ordinary job duties). The Supreme Court has described the inquiry into whether the plaintiff spoke pursuant to her official duties as a "practical one," noting that formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform. *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

The Third Circuit has articulated several factors to consider when deciding whether an employee's speech is made "pursuant to [her] official duties": (1) whether the employee's speech relates to "special knowledge or experience" acquired through the job, (2) whether the employee raises complaints or concerns about issues relating to their job duties "up the chain of command," (3) whether the speech falls within the employee's "designated responsibilities," and (4) whether the speech is "in furtherance of the employee's designated duties, even if it is not part of them." *Kimmet*, 554 Fed. App'x. at 110-11; *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007).

As noted, to satisfy the second prong of the analysis, the movant must demonstrate that her protected activity was a substantial or motivating factor in the alleged retaliatory action. *Schneck v. Saucon Valley Sch. Dist.*, 340 F.Supp.2d 558, 568 (E.D. Pa. 2004). This step requires consideration of two distinct inquires. First, whether the Defendants took an action adverse to the public employee. If so, the second step is to consider whether the motivation for the action was to retaliate against the employee for the protected activity. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 800 (3d Cir. 2000).

Here, Plaintiff spoke out, on multiple occasions, expressing her criticisms of the Revised Guidelines. Defendants argue that Plaintiff's speech is not protected under the First Amendment

8

**Appx 0013**

because her speech was made in furtherance of her official duties as a Custody Master and based on knowledge and experience she gained from that role. Moreover, Defendants argue that even if Plaintiff's speech was protected, they were unaware of it and therefore could not have retaliated against her for speech of which they had no knowledge. On the other hand, Plaintiff contends that her speech was protected, and that Defendants unlawfully retaliated against her on the basis of that speech. Plaintiff further argues that she stepped outside her chain of command to speak out about practices that, in her judgment, were putting children at risk and undermining the integrity of family court decision-making.

The Court will undertake this analysis with respect to each episode of speech in turn.

### a. Plaintiff's Memo to the Family Law Committee

On October 14, 2022, Plaintiff sent a memorandum to the FLC President, Elizabeth Kruzel ("President Kruzel"), and other members of the FLC (the "FLC Memo"). *See* ECF No. 96, Appendix 0329. The FLC Memo explained Plaintiff's perceived strengths of the County Court's then-current Custody Procedures. Plaintiff also raised objections to the Revised Guidelines, and she explained how they would diminish her role as Custody Master. According to Defendants, Plaintiff's concerns contained in the FLC Memo owed their existence to her position as a government employee and are, in essence, an employee grievance, which would not be protected. Moreover, Defendants argue that, even assuming this speech is protected, no reasonable juror could find that Defendants were aware of the contents of the FLC Memo. According to Defendants, they could not have retaliated against Plaintiff for speech that they did not know about.

Although Plaintiff emphasizes that the FLC Memo was sent to the FLC, outside the County Court's chain of command, that fact alone is not dispositive. The controlling inquiry is not the identity of the recipient, but whether the employee spoke as a citizen or pursuant to her official duties. *See Taylor v. Pawlowski*, 551 Fed. App'x 31, 32 (3d Cir. 2013) (*citing Foraker*, 501 F.3d

9

**Appx 0014**

at 243). Speech that is made pursuant to a public employee's official duties is not protected by the First Amendment, even when communicated outside the workplace or to an external audience. *Garcetti*, 547 U.S. at 421-22.

Here, the content and tone of the letter demonstrate that Plaintiff was not speaking in her capacity as a private citizen. Throughout the FLC Memo, Plaintiff repeatedly employed collective language, referring to "we" and "our," thereby presenting herself as speaking on behalf of the County Court, rather than expressing purely personal views. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("I estimate that *we* went from settling thirty to forty percent of custody cases to settling more than ninety percent of custody cases… I believe that *our* success in achieving these results can be attributed in large part to the working relationships *we* have developed with outside professionals and the extent to which *we* have made it convenient and affordable for custody litigants to use those professionals' services in resolving their cases, preparing for cases at trial, and educating the court about their disputes… As I understand it, the proposed changes to *our* existing custody procedures that were recently circulated at the Bench Bar Conference were not suggested by the bar association, individual attorneys, or even a significant percentage of the judges."). This framing conveyed institutional concerns and suggested collective knowledge and authority derived from her position as Custody Master.

Courts have consistently recognized that when a public employee frames a communication as institutional rather than personal, the speech is properly understood as made pursuant to official responsibilities and therefore falls outside the protection of the First Amendment. *See Garcetti*, 547 U.S. at 421; *Foraker*, 501 F.3d at 241-43; *Aubrecht v. Pennsylvania State Police*, 389 Fed. App'x 189, 193 (3d Cir. 2010) ("Consistent with the Supreme Court's holding in *Garcetti v. Ceballos*, we have held that where a public employee makes statements within the workplace pertaining to his or her official duties, that speech is not protected by the First Amendment.").

**Appx 0015**

Plaintiff's authoritative language weighs heavily against a finding that her speech was made in an individual, citizen capacity. In addition, Plaintiff did not disclaim authority to speak for the County Court or clarify that the views expressed were solely her own. To the contrary, the FLC Memo's repeated use of collective pronouns reinforces the impression that Plaintiff was invoking her professional role and workplace experience to lend credibility to the communication.

The substance of the letter further confirms that Plaintiff was speaking pursuant to her professional role. Much of the information described in the FLC Memo reflects knowledge acquired through Plaintiff's employment with the County Court, including internal practices, operational concerns, and the anticipated effects of the Revised Guidelines. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("Our settlement rates have improved dramatically over the past eight years, largely because parties are encouraged to take the steps necessary to prepare their cases for trial, by pursuing testing, evaluation, counseling, and/or supervised visits… If adopted, these new procedures will ensure that in the majority of cases, the trial judge will be able to insulate himself or herself from learning anything about what took place in co-parenting counseling, even though such evidence may be critically important to the best interests of the children, and even though the parties agreed in advance that such evidence would be admissible at trial"). Moreover, her concerns over judicial misconduct and child safety were tethered to her job. As noted, speech that is based on special knowledge gained through public employment, and that draws directly from workplace responsibilities, is not typically consistent with speech made as a private citizen. Further, even though "speech may be protected even if it concerns information related to or learned through public employment, an employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to [her] position as a government employee." *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017).

Plaintiff also identified herself in the FLC Memo by reference to her position as Custody

11

**Appx 0016**

Master for the County Court and detailed the functions she performed as a government employee. *See* ECF No. 96, Appendix 0329 ("Because judges are burdened with great responsibility and usually have limited time, I typically summarize these reports in my written case summary to help ensure that the judge does not miss important details… I often suggest particular evidence or subjects the judge may wish to explore at trial or specific questions the judge may wish to have answered by the trial witnesses. This new proposed rule would prohibit me from doing so."). Plaintiff went on to explain how the adoption of the Revised Guidelines would alter her duties and effect the operations of County Court. By anchoring her commentary in her official role and describing the prospective impact on her job responsibilities, Plaintiff reinforced that she was speaking in her capacity as an employee addressing matters arising from her employment, rather than as a citizen offering general commentary on public policy.

Taken together, the collective language, reliance on job-derived information, and Plaintiff's discussion of her role illustrate that the FLC Memo was made pursuant to her professional responsibilities. These features of her speech indicate Plaintiff was not engaged in protected citizen speech, notwithstanding that the FLC Memo was sent to an organization outside the County Court. Accordingly, Plaintiff cannot satisfy the threshold requirement for a First Amendment retaliation claim as it relates to this episode of speech.

### b. Plaintiff's Statements at FLC Meeting

A few months later, in January 2023, Plaintiff attended an FLC Meeting where she discussed the Revised Guidelines and noted her concerns with them. FLC President Kruzel invited several members of the Court, including Plaintiff, to attend the meeting because the FLC "had questions for Master Tresslar" and the FLC "wanted to understand the rationale" behind the Revised Guidelines. Def. Mot. for Summ. J. at 14-15. President Kruzel stated that it was important for the FLC to hear from the Custody Master because of her special knowledge and experience in

12

**Appx 0017**

handling custody cases. *Id. See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96, In her deposition, President Kruzel stated, "[Attendees] had questions for Master Tresslar… They wanted to understand the rationale behind the changes to these rules and they wanted to express the concerns that they had about the impact this would have upon our ability to amicably resolve cases without litigation… They wanted to know if she had more insight. Insight that I – you know, we were all trying to speculate and, you know, we wanted to hear from her. I mean, she is the person that, day in, day out, was conducting our conferences for years, and serving kind of as a liaison between the judges, the practitioners. So, you know, her input was really important to us."

Defendants argue that Plaintiff's speech was made squarely within the scope of her employment responsibilities as Custody Master. They assert that Plaintiff functioned as a liaison between the County Court and the FLC, a role that necessarily included attending meetings such as this one, communicating with practitioners, and discussing changes to court procedures. From Defendant's perspective, Plaintiff's presence at the FLC Meeting and her participation in the discussion were not voluntary or personal but instead flowed directly from her assigned role of conveying information and addressing questions on behalf of County Court. Accordingly, Defendants maintain that Plaintiff was acting in her official capacity when she spoke about the Revised Guidelines at the FLC Meeting, rather than as a private citizen.

Defendants further argue that, even assuming Plaintiff's speech was protected, her claim fails because she cannot establish the required causal connection between the speech and any alleged adverse action. Neither Defendant Greene nor Defendant Dally attended the FLC Meeting and Defendants argue there is no evidence that either Defendant was aware of the substance of Plaintiff's remarks. Defendants emphasize that retaliation is impossible without knowledge of the protected activity, and they maintain that no such knowledge existed here.

Plaintiff, on the other hand, argues that her speech at the FLC Meeting constituted protected

13

**Appx 0018**

speech. She contends that she had no formal responsibility to attend, received no specific directive from her supervisors to do so, and was not required, as part of her position, to speak at such an event. According to Plaintiff, her participation therefore fell outside the scope of her employment, and she maintains that she attended and spoke in her capacity as a private citizen.

The Court disagrees with Plaintiff and concludes that Plaintiff's remarks at the FLC Meeting are not protected speech because they were made pursuant to her job duties. The FLC Meeting was not open to the general public, and Plaintiff did not attend as a member of the FLC. Indeed, Plaintiff was *not* a member of the FLC and would not have had the opportunity to attend but for her role as Custody Master. Rather, she was invited to attend and specifically asked to speak and respond to questions about the Revised Guidelines, solely by virtue of her professional role as Custody Master for County Court. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("[Plaintiff] was invited to attend… [Attendees] had questions for Master Tresslar… They wanted to understand the rationale behind the changes to these rules."). Her participation was thus an extension of her employment responsibilities, not an extension of private expression. *See Flora v. County of Luzerne*, 776 F.3d 169, 179 (3d Cir. 2015) (holding that speech was unprotected where it was "intimately related to the employee's job duties"). There is no other conclusion from the record than, had Plaintiff not been the Custody Master, she would not have been permitted to speak at the FLC Meeting. Employees do not speak as citizens when the mode and manner of their speech are possible only as an ordinary corollary to their government employment. *De Ritis*, 861 F.3d at 454-55 (3d Cir. 2017). Here, Plaintiff only had the opportunity to attend, speak, and field questions about the Revised Guidelines because of her employment. Absent her employment with County Court, she would have lacked both the access and authority to do so.

Moreover, the subject matter of her speech drew directly on special knowledge and experience she possessed as a result of her work, and she spoke from that institutional vantage

**Appx 0019**

point. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 (Plaintiff was invited to attend because attendees "wanted to understand the rationale behind the changes to these rules…"). The Court also relies on the fact that FLC President Kruzel thought it would be productive if Plaintiff did not attend a prior FLC meeting because she believed that members would be more candid without a representative from the County Court present. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("I believe that I… thought maybe that members would speak more freely if she was not present, and so I said that, you know, I thought perhaps, you know, certainly she could attend if she wanted to, but that I thought that many people would be more forthcoming if she was not sitting right there."). *See also* Def. Mot. for Summ. J. at 15. This determination by the FLC as to which meetings would benefit by either the absence or presence of the County Court's Custody Master further underscores that Plaintiff's attendance and speech before the FLC were tied to her official duties. Under these circumstances, Plaintiff was acting in her official capacity as Custody Master and her speech therefore falls outside the scope of constitutional protection.

Even assuming, *arguendo*, that Plaintiff's speech was protected, her argument that Defendant's causation defense disregards direct and circumstantial evidence that a jury could credit is misplaced. The Court may accept such evidence if the speech were protected, but because it is not, Plaintiff's claims fail as a matter of law. It is not either/or, it is both. Likewise, her assertion that the chronology of events fits the retaliatory causation timeline recognized by the Third Circuit is of no moment. Questions regarding causation and Defendant's knowledge of the speech need not be addressed because the threshold issue of whether Plaintiff's speech was protected is dispositive.

### c. Plaintiff's Comments to the Judicial Conduct Board

In July 2022, a Judicial Conduct Board ("JCB") investigator interviewed Plaintiff. Defendants argue that Plaintiff's statements here are unprotected because the interview occurred

**Appx 0020**

at work and drew on her professional knowledge. Plaintiff, on the other hand, argues that speaking to the JCB about judicial misconduct and child safety concerns was outside her role as Custody Master. The Court disagrees. Absent her position as Custody Master, she would not have had the same avenue or authority to engage with the JCB.

Plaintiff's statements during her interview with the JCB provide an additional, independent basis for concluding that she did not speak as a private citizen. The interview occurred at Plaintiff's workplace, during work hours, and her speech arose directly from Plaintiff's role as an employee of County Court. Plaintiff's statements during the interview were based on her role as Custody Master, not on personal views offered as a private citizen. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("So, with this interview with the [investigator], from the Judicial Conduct Board, you kind of expressed the same things that you've expressed to Judge Morganelli… Uh huh… The things that, kind of, you were privy to and very knowledgeable about as the Custody Master?... Yes."). These circumstances strongly indicate that Plaintiff was speaking pursuant to her professional duties.

Even if Plaintiff's statements during the interview constituted protected speech (which they do not), her retaliation claim based on this episode of speech independently fails for lack of causation. "[F]or protected conduct [or speech] to be a… factor in a decision, the decisionmakers must be aware of the protected conduct." *Eskridge v. Phila. Hous. Auth.*, 772 Fed. App'x 296, 299 (3d Cir. 2018) (*quoting Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)). Said otherwise, Plaintiff cannot prove retaliation for speech without evidence indicating that Defendants knew the speech took place. Here, Plaintiff has produced no evidence that either Defendant was aware of her interview statements at the time of the alleged adverse employment action. Where there is insufficient evidence to show Defendants heard or even knew about these allegedly protected statements, a reasonable juror could not conclude that Plaintiffs' speech to

16

**Appx 0021**

the JCB was a substantial and motivating factor for the alleged retaliatory actions. Absent knowledge of speech, Defendants could not have retaliated against Plaintiff for it. Indeed, the undisputed record reflects that the JCB's rules prohibit disclosure of interview contents, and Plaintiff offers no evidence that those rules were violated or that her statements were otherwise communicated to Defendants. For example, when asked whether Judge Sletvold had ever received information that Plaintiff had participated in the interview, Plaintiff stated, "I doubt it… I think the Judicial Conduct Board is required to keep it confidential if someone complains." Speculation that Defendants may have learned of her speech to the JCB is insufficient to create a genuine issue of material fact at this stage.

## VI.    CONCLUSION

With the record as our guide, Plaintiff has failed to establish, through facts or appropriate inferences, that she engaged in protected speech or was retaliated against for doing so. Plaintiff further failed to show that Defendants were aware of such speech or that it was a substantial or motivating factor in any alleged adverse employment action.[3] Accordingly, Defendants' Motion for Summary Judgment (ECF No. 95) is **GRANTED**. An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[3] Notable is Defendants' flagging of Plaintiff's shifting argument during the course of this litigation. Reply Brief in Support of Defendants' Mot. for Summ. J., ECF No. 109.

**Appx 0022**