**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

NO. 26-1367

LISA TRESSLAR,

*Appellant*

v.

J. JERMAINE GREENE, SR. AND
THE HONORABLE CRAIG A. DALLY,

*Appellees*

---

# BRIEF OF APPELLEES

---

On Appeal from the United States District Court for the Eastern District of Pennsylvania,
Civil Action No. 24-1435
(The Honorable John M. Gallagher)

---

**Jennifer L. Hope, Esquire and Megan Mallek, Esquire**
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us

*Attorneys for Appellees J. Jermaine Greene, Sr.*
*and the Honorable Craig A. Dally*

Date: September 24, 2026

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... ii-iii

TABLE OF CITATIONS ..... iv-v

COUNTERSTATEMENT OF THE ISSUES ..... 1

COUNTERSTATEMENT OF THE CASE ..... 2

I. Material Facts ..... 2

A. Appellant's job duties as the County Court's only full-time Custody Master ..... 5

1. Appellant's role in drafting the County Court's RCG's ..... 8

2. The FLC's role in the revisions to the County Court's Custody Guidelines, including in 2022-2023 ..... 9

B. Appellant's speech at the non-public January 2023 FLC meeting where she was invited to help the FLC "understand the rationale behind the changes to" the RCGs ..... 13

SUMMARY OF THE ARGUMENT ..... 18

STANDARD OF REVIEW ..... 21

ARGUMENT ..... 22

I. The undisputed facts of record establish that Appellant's speech was made pursuant to her official duties as a Custody Master ..... 25

A. Appellant was not speaking outside of the chain of

command but to stakeholders who were an ordinary part of the custody guideline revision process .........................28

B. Appellant's speech was only possible as an ordinary corollary of her job responsibilities and thus was not protected ..........................................................................30

C. Appellant's speech focused on the design and implementation of the RCGs, the purview of her government job ........................................................................32

D. The cases on which Appellant relies are distinguishable ......................................................................35

II. None of the "disputed facts" identified by Appellant are actually disputed, and the District Court did not resolve any material facts against her ..........................................................38

III. The District Court did not abuse its discretion in striking Appellant's self-serving declaration……………………………..40

A. The District Court properly exercised its discretion striking Appellant's Declaration……………………………………...41

B. The District Court properly struck Appellant's Declaration where it attempts to misrepresent evidence already in the record…………………….....…….44

C. Even if the District Court abused its discretion, striking the Declaration was harmless error………………………...46

CONCLUSION……………………………………………………………...48

CERTIFICATE OF COMPLIANCE

# TABLE OF CITATIONS

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................21

*Berger v. Hahnemann Univ. Hosp.*,
765 Fed. App'x. 699 (3d Cir. 2019) ............................................................ 40, 43

*Bradley v. W. Chester Univ. of the Pa. State Sys. of Higher Ed.*,
880 F.3d 643 (3d Cir. 2018)........................................................................ 30-34

*Brink v. Bormann*,
No. 23-497, 2025 U.S. Dist. LEXIS 53553 (D.N.J. 2025)..................................37

*Ciarlante v. Brown & Williamson Tobacco Corp.*,
143 F.3d 139 (3d Cir. 1998)...........................................................................25

*Connick v. Myers*,
461 U.S. 138 (1983) ....................................................................................37

*De Ritis v. McGarrigle*,
861 F.3d 444 (2017).................................................................. 23, 25, 30, 31

*Dougherty v. Sch. Dist. of Phila.*,
772 F.3d 979 (3d Cir. 2014)..................................................................... 25, 29, 36

*Flora v. County of Luzerne*,
776 F.3d 169 (3d Cir. 2014)........................................................ 25, 28, 29, 35, 36

*Foraker v. Chaffinch*,
501 F.3d 231 (3d Cir. 2007)..................................................................... 25, 26, 29

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ..................................................... 22, 23, 25, 26, 30, 37, 40

*Gorum v. Sessoms*,
561 F.3d 179 (3d Cir. 2009)..................................................................... 22, 25, 26

*Graves v. Litwin*,
No. 25-6298, 2025 LEXIS 532201 (E.D. Pa. Nov. 14, 2025)................................5

*Hill v. Borough of Kutztown*,
455 F.3d 225 (3d Cir. 2006)........................................................................22

*Javitz v. Cty. of Luzerne*,
940 F.3d 858 (3d Cir. 2019)........................................................ 24, 25, 28, 29, 36

*Jiminez v. All Am. Rathskeller, Inc.,*
503 F.3d 247 (3d Cir. 2007)..................................................................... 42, 45

*Johnston v. HBO Film Mgmt. Inc.*,
265 F.3d 178 (3d Cir. 2001)........................................................................41

*Kimmett v. Corbett*,
554 Fed. App'x. 106 (3d Cir. 2014) ............................................................ 22, 23

*Lane v. Franks*,
573 U.S. 228 (2014) ............................................................................ 23, 25, 26

*Prater v. City of Phila. Family Ct.*,
569 F. App'x 76 (3d Cir. 2014)........................................................................5

*SodexoMAGIC, LLC v. Drexel Univ.*,
24 F.4th 183 (3d Cir. 2022)..................................................................... 21, 40

*Tundo v. Cty. of Passaic*,
923 F.3d 283 (3d Cir. 2019)........................................................................21

*Upshaw v. Ford Motor Co.*,
576 F.3d 576 (6th Cir. 2009)........................................................................47

## Rules

Fed. R. Civ. P. 56(a) ......................................................................... 21, 41, 43

Fed. R. Civ. P. 61 ..................................................................................46

## COUNTERSTATEMENT OF THE ISSUES

1. Whether Appellant's statements to attorney stakeholders at a non-public meeting of the Northampton County Bar Association's Family Law Committee regarding the implementation of the Northampton County Court of Common Pleas' Revised Custody Guidelines were made pursuant to her official duties—namely her responsibility for designing, implementing, and assisting attorneys with navigating the Court's custody rules—and thus not afforded First Amendment protection?

2. Whether the District Court properly exercised its discretion in striking Appellant's Declaration that lacked legal foundation, included voluminous examples of inadmissible hearsay, and contained information that was immaterial to her First Amendment claim and submitted solely for the purpose of attempting to create a dispute of material fact?

3. Notwithstanding the above, whether the District Court's striking Appellant's Declaration constituted harmless error?

## COUNTERSTATEMENT OF THE CASE

### I. MATERIAL FACTS

*"I told [Appellant] that she would be the 'gatekeeper' of the new process and that it would be her job to assist . . . attorneys by explaining the new procedures and how they were being implemented."*

- Declaration of Stephen G. Baratta, Appx0935.

*"[The Family Law Committee] had questions for Master Tresslar, they had questions for Judge Baratta. They wanted to understand the rationale behind the changes to these rules . . . ."*

- Combined Statement of Material Facts, at ¶ 122 (Admitted), Appx0903.

Appellant's tact seems to be to ignore undisputed material facts in the record, including those the District Court relied upon in reaching its summary judgment decision. In doing so, Appellant attempts to create a narrative that she was speaking "outside the chain of command" at the January 2023 meeting of the Family Law Committee ("FLC") of the Northampton County Bar Association on a topic she simply, and passively, "came to know" through her work. Brief of Appellant, ECF 22, p.10. But this framing dramatically mischaracterizes the record[1], including her actual duties as the Northampton County Court of Common

[1] Appellant also repeatedly asserts "facts" for which there is no support in the record cited, to the extent Appellant cites the record at all. For example, Appellant falsely claims that "[a]lmost all of [her remarks at the January 2023 Family Law Committee meeting] concerned asserted judicial misconduct," yet none of the materials cited stand for the proposition she suggests. *See* Brief of Appellant, ECF 22, p. 4 (citing Appx1312-1317). She claims, again based on a misrepresentation of her citations, that she "voiced no grievance about her own pay or working conditions" (*see* Brief of Appellant, ECF 22, p. 5) despite admitting two pages prior that the Revised Custody Guidelines at issue "diminished the Custody Master's role, curtailed judges' access to her, and

Pleas' ("County Court") sole full-time Custody Master as well as the law governing protected speech.

Appellant's speech at issue centers on comments she made at a non-public meeting of the FLC, an organization of which she was not a member. Because the FLC was a stakeholder and ordinary participant in the County Court's process for revising administrative rules, by virtue of the fact that FLC members litigated pursuant to those rules, the FLC President expressly invited Appellant, along with the judges and other staff of the County Court, to discuss the implementation of the Custody Division's Revised Custody Guidelines ("RCGs") at a January 2023 meeting. The reason the FLC invited Appellant was clear and attendant to her duties as Custody Master: the FLC "had questions for Master Tresslar, they had questions for [former President] Judge Baratta. They wanted to understand the

---

impaired her ability to settle custody cases . . . ." *Id.* at p. 3; *see also* Appellant's memo to the FLC, Appx0417 ("I often suggest particular evidence . . . or specific questions the judge may wish to have answered . . . This new proposed rule would prohibit me from doing so."); Appx1243, CSMF at ¶ 129 (Admitted) (admitting witnesses testified that at the January 2023 meeting at issue, Appellant spoke about how she was concerned with how the implementation of the Revised Custody Guidelines impacted her job). As well, Appellant claims she was "warned in a November 10, 2022 letter not to publicly criticize a judge" by former President Judge Michael Koury, who is not a party to this action. *See* Brief of Appellant, ECF 22, p. 5. Yet the document in question clearly relates to "public" statements made in Appellant's case summaries, which were official court documents that are distributed to parties. *See* Appx0160-163 ("Although you may in an objective format report the comments of attorneys, you may not go beyond that and write about your opinions of whether judges were legally incorrect *in these summaries*.") (emphasis added). These are just three examples from the first five pages of Appellant's brief. Needless to say, Appellant is not a reliable narrator.

rationale behind the changes to these rules . . . ." Appx1239, Combined Statement of Material Facts ("CSMF") at ¶ 122 (Admitted).

Thus, despite Appellant being the person responsible for "designing and implementing administrative procedures for the Custody Division," along with the person who was "in charge of all administrative functions of the Custody Court" since 2014, Appellant now attempts to argue that she was before the FLC and provided a platform to speak as a nonmember only as a private citizen to discuss her concerns that the new rules, if implemented, would somehow enable judges to engage in misconduct.[2] Brief of Appellant, ECF 22, p. 2; Appx0935.

The District Court properly considered the totality of the circumstances pursuant to this Court's case law and granted Appellees' Motion for Summary Judgment, having found no *genuine* issue of material fact. Appellant's speech at the January 2023 FLC meeting was made pursuant to her duties as the "gatekeeper" of the Custody Division's administrative procedures and pertained to her concerns regarding changes to those procedures. As such, her speech was not protected.

[2] Notably, at no point has Appellant filed a report with the Judicial Conduct Board based on these concerns. Appx1236.

### A. Appellant's job duties as the County Court's only full-time Custody Master.

From 2014 through her resignation in 2023, Appellant was the County Court's sole full-time Custody Master. Appx1171, CSMF at ¶ 1 (Admitted). This quasi-judicial position[3] was salaried wherein Appellant regularly performed official duties outside of normal business hours. Appx0936-37 at ¶ 18; Appx0159.

The Custody Master[4] role and duties are enshrined in the County Court's RCGs, which Appellant relied on and interacted with daily. Appx0372-73, at ¶ B. They also form the basis of Appellant's consternation in this case, because any changes to the guidelines would, of course, change her role as the Custody Master. Appx0371-0390. *See also* Brief of Appellant, ECF 22, p. 5 (stating the RCGs "diminished the Custody Master's role, curtailed judges' access to her, and impaired her ability to settle custody cases . . . ."). And while Appellant's day-to-day duties consisted of facilitating settlement conferences and preparing case summaries for judges when a custody matter did not settle pursuant to the custody

---

[3] Custody masters, such as Appellant, are considered quasi-judicial positions and are routinely afforded Eleventh Amendment immunity as they are officers of the court and therefore arms of the state. *See Graves v. Litwin*, No. 25-6298, 2025 LEXIS 532201, at *14 (E.D. Pa. Nov. 14, 2025) ("Custody or support masters and conference officers act as arms of the Family Court and are entitled to immunity for acts taken in a judicial or quasi-judicial capacity.") (citing *Prater v. City of Phila. Family Ct.*, 569 F. App'x 76, 79 (3d Cir. 2014)), *aff'd*, No. 25-3314, 2026 App. LEXIS 20895 (3d Cir. July 16, 2026).

[4] "Custody Master" is the term used by Appellant in the underlying litigation. It is synonymous with "Conciliation Conference Officer" as set forth in the RCGs.

guidelines, *see* Appx0342-0365, Appellant's attempt to minimize her role to simply performing individual custody conferences is disingenuous.

The undisputed material facts in the record establish that, outside of individual custody cases, Appellant's job duties also included:

- Since 2014, "designing and implementing administrative procedures for the custody court." Appx0040, Appx0553; Brief of Appellant, ECF 22, p.2;

- "[A]ssist[ing] . . . attorneys by explaining [Custody's] procedures and how they were being implemented" Decl. of Stephen G. Baratta, Appx0935;

- Helping attorneys navigate the County Court's Custody procedures. Oct. 9, 2023 Tresslar Memo, Appx0295;

- Being the "gatekeeper" of the Custody Division's procedures. *Id.*;

- Acting "as the judge's expert and troubleshooter on custody law and the court's custody procedures." *Id.*; and

- Any other duties as directed by the Administrative Judge. Appx0373.

Quite literally, Appellant was synonymous with the Custody Division and wielded extraordinary influence over both the attorneys and their cases that came before her.[5] Appx0746 ("She was the gatekeeper of custody cases and she operated

---

[5] Because of the power bestowed on Appellant by then-President Judge Baratta and the rules he put into place, many attorneys complained about Appellant's bias towards certain favored attorneys that came before her, as well as raised concerns that parties were being forced into settlements. *See* Appx0746 ("Master Tresslar having favorite attorneys was known in the Northampton County bar [including] a clear bias towards attorney Stan Margle, who had represented her in her custody case . . . ."); Appx0741 ("I spoke with DCA Greene on several

the Custody Division essentially."); Appx0739 ("Master Tresslar was known as the 'gatekeeper.'"); Appx0743 ("[I]f you did not agree with Master Tresslar's assessment or recommendations in the case, you could face obstacles . . . .").

In fact, Appellant described her role alongside then-President Judge Stephen Baratta as follows:

> In 2014, then-President Judge Baratta completely overhauled the custody court. He eliminated all of the part-time custody masters and hired me to be the only custody master, working full time, with an office in the courthouse, reporting directly to him. **President Judge Baratta placed me in charge of all administrative functions of the custody court.**
>
> **President Judge Baratta advised the Bar Association** that the custody court would now be court-driven, not attorney-driven, meaning that the court, not parties and attorneys, would decide how and when custody disputes would be presented to the court. He advised **that the full-time custody master would be the "gatekeeper" of the custody court, assisting parties and attorneys in filing pleadings, navigating the court's custody procedures**, and resolving ad hoc disputes informally so as to reduce the number of custody petitions filed.
>
> **President Judge Baratta directed me to act as the judges' resident expert and troubleshooter on custody law and the court's custody procedures**. He directed me to draft templates for standard custody orders and standard suggested language for dozens of provisions that judges commonly need for particular purposes in custody cases.

---

occasions about my concerns regarding Plaintiff and the running of the Custody Division, including about favoritism . . . ."); Appx0140, CSMF at ¶ 132 (Admitted) ("I have commenced scheduling the custody conferences . . . This was in an effort to alleviate several concerns of reported conflicts of interest, favoritism, etc."). Additionally, some judges on the County Court raised concerns that Custody Masters should not be providing any recommendations in their case summaries to judges or arguing for any particular party—a specific concern with Appellant's case summaries. Appx0723, Dep. of Baratta, 36:1-14.

Appx0295. (emphasis added). Family law attorneys, including those at the FLC, regularly and intimately interacted with Appellant as the person overseeing their cases before the Custody Division as the County Court's sole, full-time Custody Master. Appx0739 ("Master Tresslar was known as the 'gatekeeper.'"); Appx0749 (Master Tresslar "called herself the gatekeeper and would say that Baratta assigned her that role . . . She operated as if she had already made up her mind who should prevail.").

### 1. Appellant's role in drafting the County Court's RCGs.

Since 2014, Appellant had assisted with revisions to the Guidelines, which were "continuously being improved," meaning it was an ordinary part of her duties. Appx0553 ("[Y]ou've been involved in the revision and . . . updating of custody guidelines since you were employed as a Custody Master in 2014? A Yes."); Appx0563. In this vein, beginning around December 2021, Appellant once again stepped in to assist Administrative Judge ("AJ") John Morganelli with the newest revisions to those Guidelines, which were initiated by former President Judge Baratta. Appx1228, CSMF at ¶ 94 (Admitted). Appellant worked closely with AJ Morganelli on these revisions, which went through approximately nine drafts over the course of several months. Appx1237, CSMF at ¶ 115 (Admitted). In addition to meeting with AJ Morganelli regularly and providing comments on various drafts, Appellant also submitted a memo in June 2022, at AJ Morganelli's

direction, outlining her thoughts on the RCGs. *See* Appx0220-0260 ("Because I have served as the Court's only full-time custody master for almost eight years, you asked me to provide input on their proposed changes.").

As Appellant's June 2022 memo shows, Appellant took issue with AJ Morganelli's decision not to include a provision requiring all judges to review Appellant's case summaries, which were official court documents prepared prior to a judge presiding over a custody trial and included reference to evidence that may or may not later be deemed admissible. Appx0233-0236 ("The changes proposed . . . would effectively silence me . . . .").[6] As Appellant testified, she believed that the County Court's failure to include a provision in the RCGs that affirmatively required judges to review her case summaries—specifically her articulation of each case's facts and her summary of expert reports—would, in her view, allow judges to avoid reviewing all the evidence. *See* Appx0249.

### 2. The FLC's role in the revisions to the County Court's Custody Guidelines, including in 2022-2023.

*"I mean, [Appellant] is the person that, day in, day out, was conducting our conferences for years, and serving kind of as a liaison between the judges, the practitioners. <u>So, you know, her input was really important to us.</u>"*

- Deposition of FLC President Amy Kruzel, speaking on Appellant's role at the January 2023 FLC Meeting, Appx0682 (emphasis added).

[6] Otherwise, AJ Morganelli incorporated roughly 90% of Appellant's suggestions into the final draft RCGs, Appx1237, CSMF at ¶ 115 (Admitted).

Prior to her appearance at the January 2023 FLC meeting at issue in this case, the President of the FLC testified that Appellant had "for years [been] serving kind of as a liaison between the judges [and] the practitioners." Appx0682. Then-President Judge Baratta had created a practice whereby the County Court stakeholders, *since at least 2014*, were seen as part and parcel to the process of the County Court revising its administrative procedures, including those for the Custody Division. Appx1229, CSMF at ¶ 98 (Admitted); Appx0553, 0555-0556 (the Court's custody guidelines were "working procedures, yes, that were communicated to the Bar Association regularly . . . through meetings . . . ."). It was ordinary, in the process of revising the custody guidelines, to seek and consult with family law attorneys, including those who were members of the FLC. *Id. See also* Appx0559 (Judge Baratta "felt very strongly that if he did not get buy-in from the Bar Association, [the Custody Guidelines] would be doomed to failure.").

Appellant herself, in fact, lambasted the County Court for not having had a particular provision reviewed by the FLC, complaining that it was "[n]ever reviewed by . . . *the Bar Association* . . . ." Appx0351 (emphasis added).[7] Thus, it is undisputed that the FLC played an ordinary role in the RCG process.

---

[7] Even Appellant's counsel understood the integral and ordinary role of the FLC in the revision process of the County Court's custody guidelines. While deposing Appellee President Judge Dally, he asked: "Wasn't it a matter of routine that, when there was proposed rules, you would seek some input from the Family Law Committee?" to which Appellee replied "I thought that's what occurred . . . ." Appx661.

As set forth above, Appellant had been specifically tasked with communicating the County Court's administrative rules to attorneys, including those that came before the County Court who were members of the Bar's FLC. Appx0295. As Appellant testified:

> All of us. All the judges. Everyone. And **<u>the attorneys were intimately involved in the evolution process [of the Custody Guidelines]. They were constantly talking to me and talking to President Judge Baratta</u>** about what worked, what didn't work, what might help. Any system of that nature can always be improved, and it was continuously being improved.

Appx0562-0563 (emphasis added).

In 2022, as was customary for the County Court in the custody guidelines revision process, AJ Morganelli sought input from the FLC. Appx1230, CSMF at ¶ 99 (Admitted). As well, former-President Judge Koury had numerous back and forth communications with FLC as part of the Guideline revision process, including a memo from the FLC with comments and questions. Appx1357-1359; Appx0672 ("I would summarize . . . the views of the [FLC] and submit that to . . . President Judge Koury"); Appx0679 ("[T]hat was part of the emails that I was sending to President Judge Koury [and] the purpose of my memorandum, was I, in addition to other members, had questions about how these rules came to be and why they were being changed."); Appx0681. Additionally, the FLC held two meetings for members to discuss the RCGs and prepare comments for the County Court. *Id*. The first was in October 2022 which Appellant did not attend; the FLC

President told Appellant it would be best if she did not because she thought FLC members would be more open without her, as the County Court's Custody Master, present. Appx0677, Dep. of FLC President Kruzel 133-34:14-4 ("[I]n my capacity as the president at that time, [I] thought maybe that members would speak more freely if she was not present . . . .").

Before the October 2022 meeting, however, Appellant provided FLC members with a memo (the "October 2022 Memo") discussing the RCGs and their implementation, which mirrored her June 2022 memo written at AJ Morganelli's direction.[8] Appx0672, Dep. of FLC President Kruzel 48:11-17; Appx0581, Dep. of Tresslar, 164:11-16; Appx0586, Dep. of Tresslar, 177:11-13. As the District Court noted, Appellant held herself out in the memo to the FLC as the County Court, not a private citizen. Appx0017-0019. For example, the first paragraph reads:

> The Strengths of ***our*** Current Custody Procedures
>
> Under Judge Baratta's leadership, the court dramatically improved the rate at which custody cases were settled. I estimate that ***we*** went from settling thirty to forty percent of custody cases to settling more than ninety percent of custody cases. This has dramatically reduced the overall burden of custody cases on the court… I believe that ***our*** success in achieving these results can be attributed in large part to the working relationships ***we*** have developed with outside professionals and the extent to which ***we*** have made it convenient and affordable for custody litigants to use those professionals' services in resolving their

[8] The District Court concluded that Appellant's October 2022 Memo was not protected speech based on "the collective language, reliance on job-derived information, and Plaintiff's discussion of her role." Appx0017. Appellant did not appeal that holding.

cases, preparing their cases for trial, and educating the court about their disputes.

Appx406 (emphasis added). At no time in her communication with the FLC did Appellant distance herself from her official role. As the District Court noted, she embraced it. *See* Appx0019-20 ("[T]he subject matter of her speech drew directly on special knowledge and experience she possessed as a result of her work, and she spoke from that institutional vantage point.").

### B. Appellant's speech at the non-public January 2023 FLC meeting where she was invited to help the FLC "understand the rationale behind the changes to" the RCGs.

The FLC held another meeting to discuss the County Court's RCGs in January 2023.[9] Appx0554-0556, 0559, 0562-0563, 0710-0711. Unlike the October 2022 meeting, which was limited to members only, the FLC invited "all Judges, and all Masters, as well as their staff" to attend this meeting, including Appellant. Appx1239, CSMF at ¶ 120 (Admitted). Appellant could not have attended the meeting but for her position with the County Court, as she was not a member of the FLC and FLC meetings were not open to the public. Appx1242, CSMF at ¶ 124 (Admitted) ("Even though Plaintiff was not a member of the FLC, and its meetings

[9] This meeting was originally scheduled for November 2022 but the FLC rescheduled it to accommodate Judge Baratta's schedule. Appx0681.

are not open to the public, "nobody would have told [Plaintiff] not to come. [She] was the Custody Master.").

As Appellant admitted:

> 122. The FLC invited Plaintiff to the FLC meeting because they "had questions for Master Tresslar, they had questions for Judge Baratta. They wanted to understand the rationale behind the changes to these rules . . . ." Kruzel Dep. 86-7:24-13 (Appendix 0543).
>
> **Plaintiff Response**: Admitted.

Appx1239.

> 125. Former Judge Baratta also attended and provided background on why the Court had set up the Custody Division the way it had, as well as fielding questions with Plaintiff about the RCGs; Plaintiff raised the concerns set forth in her June 2022 Memo. Panella Dep. 121:15-122:22 (Appendix 0508-0509); Kruzel Dep. 76:9-12 (Appendix 0542); 87:14-20 (Appendix 0544); Tresslar Dep. 159:15-19 (Q: "And, at that meeting, you spoke, again, kind of, about your concerns you set forth in your June 2022 [M]emo to AJ Morganelli?" A: "Yes.").
>
> **Plaintiff Response**: Admitted.

Appx1242.

Pursuant to the invite the County Court received, Appellant spoke and fielded questions about the RCGs with the architect of the current Custody Division, former President-Judge Baratta. He is also the person who testified that he considered himself responsible for "communicat[ing . . .] new procedures to . . . the Family Law Committee." Appx0933 at ¶ 7; Appx938 at ¶¶ 24-25 ("I frequently

met and corresponded with the [FLC] about my directives and procedures for the custody court."). *See also* Appx1360, 12/5/2022 Text Message between FLC President and Appellant ("I would send your invitation to Judge Baratta. He can then forward it to the other judges . . . I will have the list of email addresses ready for you tomorrow. You may pick it up at the courthouse at your convenience.").[10]

Appellant's comments during this meeting mirrored those made in her June 2022 Memo (written at the direction of the AJ) and her October 2022 Memo to FLC leadership, and included her issues that implementation of the RCGs would allow judges to avoid receiving evidence that she thought they should receive prior to trial. Appx0673, Dep. of Kruzel, 75:11-22; Appx0675, Dep. of Kruzel, 87:3-20.

On appeal, Appellant attempts to recast her speech and argue that she was acting as a whistleblower regarding asserted judicial misconduct, wholly outside the scope of her duties as the person responsible for designing and implementing Custody Division policy. Brief of Appellant, ECF 22, p.23. This reframing, however, is not borne out by the record. Rather, the record confirms that Appellant's alleged concerns regarding "judicial misconduct" and her concerns regarding the effects of the RCGs were one in the same.

Multiple attendees from the meeting were deposed during this litigation, and every single one corroborated that Appellant's speech centered on the RCGs,

---

[10] This is another clear example of Appellant liaising between the County Court and the FLC.

including changes that impacted her own job duties. For example, one attendee testified:

> "[Appellant] was just **talking about the policies and procedures** and how we can better get the judges to understand about the expert witness testimony . . . and what we would like to see in custody orders, and if she could communicate that to the judges, **and how we could best facilitate these new procedures and issues with the judges**."

Appx0692, Dep. of FLC member Crouthamel, 42:1-9: (emphasis added).

Another attendee testified:

> "[Appellant] **talked about the concerns about the new rules that had been proposed**, and specifically not being able to talk to – have the judges talk to her, not having the reports being part of their pretrial information, not getting summaries . . . ."

Appx0731, Dep. of FLC member Kingsley, 40:1-14 (emphasis added).

FLC President Amy Kruzel, who invited "Master Tresslar" to the meeting because of her role with the County Court, testified: "it was very clear that [Appellant] was opposed to specific changes [to the RCGs], particularly those that had to deal with reports, evaluations, and summaries." Appx0675. These are expressly the purview of her duties as the Custody Master. *See* Appx0346-7, Revised Custody Guidelines (including reviewing all reports, communicating reports, and preparing summaries).

Now-Judge Brian Panella testified: "Master Tresslar was easily the most vocal person in the room against the rules. She had concerns that in some way it was going to impede her abilities." Appx0639.

Even Appellant understands her comments in the context of the RCG's, their implementation, and the effect it would have upon her position. To wit: "[T]hese judges not only would be silencing the custody master [ . . . ] This new proposed rule would prohibit me from [suggesting particular evidence or subject the judge may wish to explore at trial or specific questions the judge may wish to have answered by the trial witness]." Appx0406, October 2022 Memo to the FLC.

## SUMMARY OF THE ARGUMENT

When an employee is invited to a non-public meeting to speak as a representative of her government employer and field questions on the employer's administrative rules that the employee is responsible for designing, implementing, and communicating to attorneys, is that speech pursuant to her official duties? The answer is clearly yes.

**Citizen speech.** Appellant's invitation-only speech to the FLC about the County Court's RCGs—which she was charged with designing and implementing as the "gatekeeper" of the County Court's Custody Division since 2014—was not made as a private citizen. It could not have been. The speech was pursuant to her official duties as the County Court's sole Custody Master. Both Appellant and the President of the FLC stated that Appellant was there because of her history as acting as the County Court's liaison with the FLC, both in the rule revision process and in matters in which individual FLC members appear on a day-to-day basis. In fact, she could not have attended the FLC meeting otherwise, since it was a non-public meeting and she was not an FLC member. Appellant admits it: "nobody would have told me not to come. I was the Custody Master." Appx1242, CSMF at ¶ 124 (Admitted).

Appellant attempts to dismiss her vast sway and control over the Custody Division by claiming that her knowledge of the Guidelines is just a "matter she

came to know through her work." Brief of Appellant, ECF 22, at p. 10. Yet the record is replete with evidence that her very job was not only expressly dictated by the custody guidelines themselves, but that the process of their drafting, revising, and implementing was within the purview of her ordinary duties, including working with attorneys at the FLC during their drafting. The RCGs are inseparable from the speech at issue in this case.

**The correct standard.** Contrary to Appellant's assertion, it is clear from the District Court's opinion that it did not rely on an improper "related to" standard in making its decision. A reading of the District Court's opinion and the cases it cites shows that the District Court conducted a holistic analysis as required by First Amendment jurisprudence. Even if it had applied an improper standard, however, the overwhelming record evidence supports summary judgment and the District Court's conclusion that Appellant was not speaking as a private citizen but firmly as a County Court employee, and thus her speech was not protected under the First Amendment.

**There are no genuine materially disputed facts.** Appellant asserts that the District Court's "sole support for finding that Tresslar acted as a 'liaison' to the Committee was the subjective view of an outside party, contradicted by Tresslar and by her supervisor . . . ." and that such reliance involved resolving a disputed fact, namely the scope of Appellant's duties. Brief of Appellant, ECF 22, at p.12.

Appellant is wrong. First, her articulation misrepresents the District Court's holding, which did not rely solely on the FLC President's testimony but on a holistic analysis of the record. But more importantly, this is not a disputed fact. The relevant and admissible testimony by the FLC President is not merely "the subjective view of an outside party" but an undisputed fact from a stakeholder in the revision process who confirms what the record already shows: Appellant was acting as a go-between between the County Court and practitioners, whether she chooses to adopt the term "liaison" or not. Former-Judge Baratta's declaration asserting that he had not "asked her to act as a liaison" does not mean that she was not acting as such, especially where that same declaration identifies her as the person responsible for communicating with attorneys about the County Court's procedures and rules, i.e. liaising about the RCGs.

**The District Court striking Appellant's self-serving declaration.**

Appellant's declaration is replete with legal conclusions, irrelevant or impertinent information, and inadmissible hearsay and was thus properly stricken by the District Court as an obvious and transparent last-ditch effort to manufacture an issue (but not a genuine one) of material fact. Further, even if the District Court had considered Appellant's declaration, it would not have mandated a different result and the District Court striking the declaration was harmless error.

## **STANDARD OF REVIEW**

This Court reviews a district court's grant of summary judgment de novo. *Tundo v. Cty. of Passaic*, 923 F.3d 283, 286 (3d Cir. 2019). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The District Court's order striking Tresslar's declaration is reviewed for abuse of discretion. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 198 (3d Cir. 2022).

## ARGUMENT

"Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006).

To establish a prima facie claim for First Amendment retaliation, Appellant must show: 1) she engaged in activity protected by the First Amendment, and 2) the protected activity was a substantial factor in the government employer's retaliatory action. *Kimmett v. Corbett*, 554 Fed. App'x. 106, 110-11 (3d Cir. 2014) (quoting *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)). Whether an employee's speech is protected for purposes of this first element is a question of law. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

For a public employee's speech to be protected, it must be: 1) made as a citizen, as opposed to pursuant to their official duties, 2) regarding a matter of public concern and, if both elements are satisfied, 3) the government employer must lack an adequate justification for treating the employee differently from any member of the public. *Kimmett*, 554 Fed. App'x. at 110-11 (cleaned up).[11]

[11] While only the first element is at issue on appeal, Appellant misrepresents that the second element regarding whether her speech was on a matter of public concern as "satisfied and uncontested." *See* Brief of Appellant, ECF 22, p.16. Appellee's summary judgment papers are very clear: "While Defendants do not address the remaining elements here, they do not concede

In determining whether speech is made pursuant to an employee's official duties or as a private citizen, this Court makes "a practical inquiry, [ . . . ] and assess[es] whether the speech at issue is itself ordinarily within the scope of an employee's duties." *De Ritis v. McGarrigle*, 861 F.3d 444, 453 (2017) (citing *Garcetti*, 547 U.S. at 424 and *Lane v. Franks*, 573 U.S. 228, 240 (2014)) (cleaned up). In making this inquiry, the Court does not use "such simple tests as whether the employee spoke 'within the office,' whether his statements were made pursuant to duties described in his '[f]ormal job description[],' or whether 'speech concerns information related to or learned through public employment.'" *De Ritis*, 861 F.3d at 453 (cleaned up).

The Supreme Court and the Third Circuit have not "articulated a comprehensive framework for defining the scope of an employee's duties" but do consider a number of factors including, but not limited to: 1) whether the speech relates to "special knowledge or experience acquired through [the] job," 2) whether the speech raises issues about job duties "up the chain of command," 3) whether the speech falls within the employee's "designated responsibilities," and 4) whether the speech is "in furtherance of the employee's designated duties, even if it is not part of them." *Kimmett*, 554 Fed. App'x. at 111 (cleaned up); *see also*

that Plaintiff could establish these elements at trial and reserve the right to dispute them at such time." Appx0087.

*Javitz v. Cty. of Luzerne,* 940 F.3d 858, 865 (3d Cir. 2019) (who the employee spoke to, what they spoke about, and why they spoke in the first place are all relevant to the First Amendment analysis).

Here, the District Court aptly recognized that Appellant had not engaged in activity protected under the First Amendment, as her statements were not made in her capacity as a private citizen. Contrary to Appellant's argument, the District Court did not base its decision on any one fact, but instead considered the record in its entirety and conducted the practical analysis required by this Court's precedent. *See* Appx0017-20. Facts of particular import to the District Court included: 1) that the FLC specifically invited "Master Tresslar" because members "wanted to understand the rationale" behind the RCGs; 2) the subject matter of Appellant's speech drew directly on her special knowledge and experience as a Custody Master, and she spoke to the FLC from an institutional vantage point; 3) the FLC meeting was not open to the general public, and Appellant, as a non-member, was only able to attend because she was asked to speak and field questions about the RCGs; and 4) the fact that the FLC President thought it would be productive if Appellant did not attend a prior meeting of the FLC because she believed members would be more candid without a member of the Court present. *Id*.

As discussed more fully below, the District Court correctly ruled that the record, as a whole, overwhelmingly established that Appellant was speaking

pursuant to her duties as the County Court's sole full-time Custody Master.[12] As such, her speech was unprotected.

### I. The undisputed facts of record establish that Appellant's speech was made pursuant to her official duties as a Custody Master.

While the Court must view the facts regarding Appellant's speech at the January 2023 FLC meeting in the light most favorable to Appellant, it does not need to accept her unsubstantiated characterization of that speech, especially when that characterization is based on wishful thinking that ignores and contradicts the record below.

As set forth above, the question of whether an employee's speech is citizen speech is a practical one that focuses on whether the speech at issue is ordinarily within the scope of the employee's duties. *De Ritis*, 861 F.3d at 453 (citing *Garcetti*, 547 U.S. at 424 and *Lane*, 573 U.S. at 240) (cleaned up). In other words, the question is whether the employee was speaking as part of her job or merely speaking about her job. *Compare Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979

---

[12] Appellant asserts the District Court applied the wrong standard—specifically a "related to" standard—in reaching its determination. This is incorrect. While the District Court did misquote the holding in *Flora*, it also cited *Garcetti* in holding that the inquiry is a practical one then cited to this Court's precedent in *Kimmet*, *Gorum*¸ and *Foraker* in listing the factors that go into the inquiry. *See* Appx0011-0013, 0017-0020. More importantly, the District Court did not simply rely on a "related to" standard, but examined where Appellant spoke, what she spoke about, and why she spoke—as this Court holds is proper. *See Javitz v.,* 940 F.3d at 865. Further, because this Court reviews summary judgment decisions de novo, whether a district court applied the correct substantive law is of no moment. *See Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145 (3d Cir. 1998) (stating that the court's "task is to lay out the substantive law" in reviewing summary judgment motions).

(3d Cir. 2014) (providing a report to the Philadelphia Inquirer was not pursuant to the employee's job duties but simply related to them) and *Lane*, 573 U.S. at 239-40 (community college employee providing sworn testimony pursuant to a subpoena about corruption witnessed at work speaks about their job, not as part of it) *with Garcetti*, 547 U.S. at 421 (assistant district attorney drafting a memo, regardless of whether it was expressly commissioned, recommending dismissal of a case does so as part of his job), *Foraker v. Chaffinch*, 501 F.3d 231, 241-42 (3d Cir. 2007) (state troopers were speaking pursuant to their official duties when they expressed concerns about deficiencies at a firing range since monitoring the range was "among the tasks [they] were paid to perform"), and *Gorum v. Sessoms*, 561 F.3d 179 (3d Cir. 2009) (professor's off-duty remarks at a student's disciplinary hearing, which were based on his special knowledge and experience with the school's disciplinary code, were made pursuant to official duties).

The record regarding Appellant's comments at the FLC meeting is comprised almost exclusively of statements and testimony from Appellant and her own witnesses, who she both identified and chose to depose, including members of the FLC and former-President Judge Baratta. That record establishes that Appellant was speaking pursuant to her job duties, not merely about them:

- Appellant was responsible for the administration of the Custody Division, which included designing, implementing, and explaining the Division's Custody Guidelines to family law attorneys. Appx0295.

- The County Court, through Appellant, had been designing custody policies with input from the FLC since 2014, which included members of the County Court occasionally attending FLC meetings. Appx0040, Appx0553; Brief of Appellant, ECF 22, p.2.

- Appellant was responsible for helping design the RCGs that formed the basis for her speech at the January 2023 FLC meeting. *Id.*

- In keeping with past practice, Appellant and other members of the County Court were invited to the FLC's January 2023 meeting specifically to answer questions about the rationale behind the RCGs. Appx0903, CSMF at ¶ 122 (Admitted). *See also* Appx0906, CSMF at ¶ 125 (Admitted).

- Appellant spoke and fielded questions with former President Judge Baratta, who was the architect of the County Court's Custody Division, and whom the FLC President also expressly wanted to hear from on the RCGs. *Id.*

- Appellant relied upon her specialized knowledge of the County Court Custody Division's day-to-day procedures, her specialized knowledge of the proposed rule changes, and her specialized knowledge of the County Court's rationale in proposing these changes when answering questions posed by FLC attorneys. Appx0406-420; Appx0906, CSMF at ¶ 125 (Admitted).

- During this meeting, Appellant shared her concerns over the implementation of the Guidelines as written and how it would affect her job in relation to judges of the County Court in individual matters. Appx0673-0675.

- Appellant was expressly **not** invited to the FLC's prior October 2022 meeting about the RCGs because the FLC President believed that FLC attorneys would be more candid without a representative of the County Court present. Appx0677.

On appeal, Appellant ignores these facts and wants this Court to ignore them too. She asks this Court to credit her unsubstantiated reframing of her speech: that

she "stepped outside her chain of command" *sua sponte* to blow the whistle on reported judicial misconduct (to a body that could do nothing about it), while claiming that she simply "came to know" such information through her job. Brief of Appellant, ECF 22, at pp. 10, 22-23. Thus, she argues that her speech is analogous to the protected speech at issue in *Javitz v. Cty. of Luzerne,* 940 F.3d 858 (3d Cir. 2019) and *Flora v. County of Luzerne*, 776 F.3d 169 (3d Cir. 2014). This position is untenable for several reasons.

### A. Appellant was not speaking outside of the chain of command but to stakeholders who were an ordinary part of the custody guideline revision process.

As an initial matter, Appellant was not speaking "outside the chain of command" at the FLC meeting. She was invited in her role as Custody Master. Appx1239, CSMF at ¶ 120 (Admitted). And she attended and answered questions at the FLC meeting with the former President Judge, who was the architect of the County Court's Custody Division and whom she identifies repeatedly in her brief as her supervisor and the person responsible for communicating with the FLC on custody rules. *Id.*; *see also* Appx1242. Further, even if former Judge Baratta had not been standing beside her fielding questions from the FLC, in speaking with the FLC—a group comprised of attorneys who represent clients in matters over which Appellant herself presides about the changes that govern the rules of those very interactions—she was not "outside the chain of command." While she was not

speaking *up* the chain of command as contemplated in *Foraker* (501 F.3d at 241-42), she also was not speaking outside of it: the FLC was an ordinary participant in the revision to the County Court's custody guidelines. Appx1229, CSMF at ¶ 98 (Admitted); *see also* Appx0553, 0555-0556.

Likewise, she was not bringing a claim to an impartial court (*Flora*,[13] 776 F.3d at 180), she was not speaking to the press (*Dougherty*, 772 F.3d at 990) and she was not speaking to a district attorney to report a crime (*Javitz,* 940 F.3d at 866-7). Rather, she was speaking to the attorneys who appeared before her every day, who referred to her deferentially as "Master Tresslar," and who were bound by the custody guidelines for their cases before the County Court. She spoke, for lack of a better word, down the chain of command to stakeholders, many of whom likely appeared before her within the days that followed and who were subject to the custody guidelines themselves.

Her argument that "[d]iscipline for speech the employer tried to prevent is not the employer's control over its own commissioned product" (Brief of Appellant, ECF 22, p. 23) does not change this fact. Setting aside that Appellant's reframing—specifically as it relates to Appellees "tr[ying] to prevent" Appellant's

---

[13] Procedurally, *Flora* was an appeal of the grant of a motion to dismiss. 776 F.3d 169 (3d Cir. 2014). This Court only decided that the *Flora* plaintiff plausibly stated a claim for First Amendment retaliation, not that the *Flora* plaintiff spoke as a citizen, as Appellant seems to believe. 776 F.3d at 179-80; Brief of Appellant, ECF 22, at pp. 24-26.

speech—finds no support in the record, her assertion would mean that a government employee can always speak on behalf of the body that employs them with the protection of the First Amendment as long as that speech was "unauthorized." But this position has no support in First Amendment jurisprudence. *See Bradley v. W. Chester Univ. of the Pa. State Sys. of Higher Ed.*, 880 F.3d 643, 653 (3d Cir. 2018) (plaintiff's criticism of employer's budget process as unethical was still made pursuant to her job duties, even if supervisor told her not to make such statements); *Garcetti*, 547 U.S. at 421 (assistant district attorney who drafts a memo, *regardless of whether it was expressly commissioned*, recommending dismissal of a case does so as part of his job).

### B. Appellant's speech was only possible as an ordinary corollary of her job responsibilities and thus was not protected.

Appellant glosses over the fact that her speech at the FLC meeting was only possible as an ordinary corollary to her position as a Custody Master. *See De Ritis*, 861 F.3d at 454 ("[A]n employee does not speak as a citizen if the *mode and manner of his speech* were possible only as an ordinary corollary to his position as a government employee.") (emphasis added); *see also Garcetti*, 547 U.S. at 424 ("a public employee speaks pursuant to employment responsibilities . . . [when] there is no relevant analogue to speech by citizens who are not government employees.").

There is no citizen analog to Appellant's speech: ordinary citizens are not invited to closed bar association meetings where they are given the floor to speak for nearly two hours and answer questions on the County Court's policies that they drafted pursuant to their work for the County Court. *See*, *e.g.*, *Bradley*, 880 F.3d at 652 (speech was not made as a citizen in part because it was made at a meeting that was not open to the public and that she was only able to attend because of her job). And ordinary citizens, completely divorced from the custody guideline revision process, could not possibly help FLC understand the "rationale" of those proposed revisions. Appx0903, CSMF at ¶ 122 (Admitted). *See also* Appx0906, CSMF at ¶ 125 (Admitted) (Appellant's role in the meeting involved fielding questions from FLC attorneys with Judge Baratta about the RCGs and the rationale behind them).

Appellant's counterargument—that her speech occurred outside the courthouse and should therefore be treated differently (*see* Brief of Appellant, ECF 22, pp. 26-27)—ignores the holistic analysis this Court employs. *Where* an employee speaks is not a dispositive factor. *See De Ritis*, 861 F.3d at 453. Appellant was invited to the meeting as a member of the County Court and was fulfilling her role as "gatekeeper" of the custody procedures and the person charged with the administration of the Custody Division about the rules of the Custody Division. Appx295, 903.

Further, Appellant's argument that her speech is protected because the FLC is not an arm of the County Court is erroneous. (Brief of Appellant, ECF 22, p. 22.) As this Court held in *Bradley*, whether an employee bypassed the "normal pecking order" is not dispositive as to whether they were acting pursuant to their official duties. *Bradley*, 880 F.3d at 653 (declining to adopt a "normal pecking order" standard and rejecting claim that speech was private because it was not the employee's ordinary duties to report outside the chain of command where she was responding to a direct question when reporting to a committee).

### C. Appellant's speech focused on the design and implementation of the RCGs, the purview of her government job.

Next, Appellant's post hoc attempt to discredit her own testimony as well as that of her own witnesses about her speech at the FLC meeting is unsupported by the record. ***Every single witness*** who testified about Appellant's speech at the FLC meeting, including Appellant herself in her Amended Complaint, agreed that her speech focused on implementation of the County Court's RCGs and included Appellant's concerns that those Guidelines would allow judges to avoid hearing evidence she deemed important. Appx0045, Appellant's First Amended Complaint at ¶ 36 ("In January 2023, Plaintiff attended a meeting of the [FLC] at which she spoke publicly . . . to state her concerns about the procedures that had been proposed . . . ."); Brief of Appellant, ECF 22, p. 14 ("Tresslar challenges the dismissal of that claim as it concerns her remarks to the Family Law Committee of

the Northampton County Bar Association at its January 12, 2023 meeting, ***where she opposed proposed revisions to the county's custody procedures***."); *see infra* (Material Facts § I(B)(1)). Appellant cannot now run away from the record she created by arguing on appeal that "[a]lmost all of [her speech] concerned asserted judicial misconduct"[14] unrelated to the Guidelines she was responsible for developing and explaining to attorneys. Brief of Appellant, ECF 22, p. 4. This, again, is a characterization devoid of foundation.

Finally, despite admitting that designing and implementing administrative procedures for the Custody Division was part and parcel to her role, Appellant now takes the contrary position that "[h]er responsibilities centered on individual cases" and "[a]dvocating policy positions to the Northampton County Bar Association or its committees was not among [her] duties." Brief of Appellant, ECF 22, p. 2. Appellant's attempts at narrowing her job duties are not only untrue but they mirror those this Court rejected in *Bradley* and are similarly unpersuasive here.

In *Bradley*, the appellant's job as the Director of Budget and Financial Planning was not renewed after she raised concerns during a committee meeting about appellee's asserted unethical conduct in manipulating its budget. 880 F.3d at 653. Bradley argued that her speech fell outside the scope of her official duties

[14] Again, this is an instance where the record cited by Appellant does not support the proposition.

because her ordinary duties did not include "investigat[ing] misrepresentations of financial information" or "report[ing] willful misrepresentations of financial information." *Id.* at 653. This Court rejected such reasoning, stating that, generally, "scrutinizing and analyzing the numbers appearing in the budget was part of her job." *Id.* As such, she could not argue that statements made at the committee meeting about the budget were not part of her job, even if she was reporting alleged misconduct.

Like Bradley's attempts to remove "investigating misrepresentations of financial information" from the scope of her official duties, Appellant cannot argue that her comments about how implementation of the RCGs could enable misconduct were somehow made outside the scope of her job duties, which were to design, implement, and communicate those Guidelines to County Court stakeholders pursuant to the County Court's established procedures. Especially when she was only invited to the FLC meeting to speak, from an institutional vantage point, as to her special knowledge gained through her work and because of her position as Custody Master speaking for the County Court.

Taken together, the totality of the circumstances establish that Appellant spoke pursuant to her official duties as the County Court's full-time Custody Master: she was invited to the non-public meeting due to her position as Custody Master; she was invited specifically to articulate the County Court's "rationale"

behind the rule changes; she was invited because of her ordinary involvement in designing and implementing administrative procedures for the Custody Division; and she spoke about and answered direct questions about the RCGs. At no time did she distance herself from her role as the County Court's representative. As such, the District Court correctly held that her speech at the January 2023 FLC meeting was not protected under the First Amendment.

**D. The cases on which Appellant relies are distinguishable.**

Appellant relies on factually distinguishable cases in her argument. As an initial matter, Appellant's reliance on *Flora v. Cty. of Luzerne*¸ which is the foundation for much of her argument, is of no moment here due to its procedural posture. That case involved a motion to dismiss. Thus, this Court held only that the plaintiff had *pled* sufficient facts regarding the scope of his official duties to survive a motion to dismiss. *Flora v. Cty. of Luzerne*, 776 F.3d 169, 171n.1 (3d Cir. 2015) ("Because we are reviewing the grant of a motion to dismiss, we recount the facts as alleged by the non-movant, Flora, accepting them as true and construing them in the light most favorable to him."). Notably, it made no determination that the record would or could support a finding of citizen speech down the line. *Id.* Indeed, the Court cautioned: "That such a dispute exists at this stage does not mean that one will, after discovery, remain for trial, and we do not imply that summary judgment will necessarily be inappropriate. That is a question

left for the District Court after development of the record." 776 F.3d at 175n.9. In comparison to *Flora*, Appellant cannot rely on mere allegations in responding to summary judgment.

Further, in the cases Appellant cites, the speech at issue was wholly outside the scope of the work the employees were paid to perform. *See Flora* (filed a lawsuit), *Kennedy* (engaged in prayer), and *Javitz* (reported a crime). In contrast, the FLC *invited* Appellant, specifically as the County Court's Custody Master, and to specifically discuss the rationale behind the County Court's RCGs, which she did. Appx0673-0675. Thus, the "who," "how," and "why" of Appellant's speech supports the District Court's conclusion that Appellant's speech was made pursuant to her official duties. *See Javitz, supra.*

In addition, the FLC was not akin to, for example, a newspaper or a district attorney's office. *See Flora v. Cty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015)*; Javitz v. Cty. of Luzerne,* 940 F.3d 858 (3d Cir. 2019)*; Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014). Rather, the FLC are part and parcel to the County Court's revision process for its procedural rules, including the Custody Guidelines, and it was routine for the County Court to get their input. *See infra* (Material Facts § I(A)(2)); *see also* Appx0351, Appellant's comments on the Final RCGs (Appellant complaining that a provision was "[n]ever reviewed by . . . the Bar Association" as customary); Appx0559 (Judge Baratta "felt very strongly that if he

did not get buy-in from the Bar Association, [the Custody Guidelines] would be doomed to failure.”); Appx1083-1084; Appx1357-1358. This was squarely within her job duties and commonplace for the County Court’s process of revising its policies.

Considering the undisputed facts of record, Appellant’s unsupported claims that she took it upon herself to speak to the FLC of her own accord and therefore did so as a citizen are of no moment. *See Brink v. Bormann*, No. 23-497, 2025 U.S. Dist. LEXIS 53553, at *20 (D.N.J. 2025) (“Despite Plaintiff's attempts to conclusively plead that she initiated discussions ‘as a citizen,’ … stating such does not make it so.”); *see also Garcetti*, 547 U.S. at 420 (“Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to ‘constitutionalize the employee grievance.’”) (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

Appellant and the County Court had a long history of communicating with the FLC attorneys regarding revisions to the County Court’s custody guidelines, and at no time did Appellant indicate that she was at the January 2023 FLC meeting in any other capacity than the one she was invited as: the Custody Master.

In this context and taking all facts in a light most favorable to Appellant, there is no way to divorce Appellant from her role as the County Court’s Custody Master. As former President Judge Baratta said: “The Custody Master is our

person, our employee, our agent." Appx1364. Even more, Appellant admits it: "nobody would have told me not to come. I was the Custody Master." Appx0580.

## II. None of the "disputed facts" identified by Appellant are actually disputed, and the District Court did not resolve any material facts against her.

While Appellant claims Appellees' Motion for Summary Judgment turned on several disputed material facts, the "disputes" were between the undisputed record and the unsupported fable Appellant continues to proffer on appeal. She has not pointed to any evidence *in the record* that contradicts the facts with which she takes issue, namely, that the District Court found that Appellant was operating as a liaison to the FLC during her tenure as the County Court's Custody Master.

Specifically, Appellant claims:

> The sole support for the court's finding that Tresslar acted as a liaison to the [Family Law] Committee was the subjective view of an outside party, contradicted by Tresslar and her supervisor's sworn declaration that he never asked her to act as a liaison. Resolving that dispute against the non-moving party was reversible error under Rule 56.

Brief of Appellant, ECF 22, at p.12; *see also id.* at p. 21 ("No judge or administrator instructed, assigned, or required Tresslar to attend the meeting or to speak.").

Yet an examination of the evidence reveals no actual conflict and that Appellant's approach is form over function. In his Declaration, former Judge Stephen Baratta stated that he did not specifically direct Appellant to act as a

"liaison" with the FLC when he was President Judge in 2014. Appx0938, at ¶ 24. However, in that same Declaration, in addition to Appellant's memos, then-Judge Baratta *did* direct her to "assist" attorneys in navigating the court's custody procedures, "explain[] the new procedures and how they were being implemented," and "manage the court's procedures . . . ." Appx0935, at ¶ 7; Appx0296.[15] While Appellant seems caught up in the FLC President's specific use of the term "liaison," the actions Appellant took, including those directed by former Judge Baratta, describe the function of liaising.[16] And it also describes the actions Appellant was taking at the meeting. *See* Appx 1243, CSMF at ¶130 (Admitted) ("[Appellant] was just talking about the policies and procedures and . . . how [the FLC] could best facilitate these new procedures and issues with the judges.").

Appellant relies heavily on former Judge Baratta's statement that he did not ask her to act as a liaison and that he would communicate with the FLC himself on the County Court's rules. Which he did, standing right next to Appellant at the

---

[15] Even had former Judge Baratta stated that she was expressly directed **not** to be a liaison, which he did not, that would still not be dispositive, and the Court would still be required to conduct a holistic analysis as set forth in First Amendment caselaw.

[16] To be pedantic, Merriam Webster defines a liaison as "a person who establishes and maintains communication for mutual understanding and cooperation." https://www.merriam-webster.com/dictionary/liaison (last visited September 12, 2026). This clearly defines Appellant under the record.

FLC's January 2023 meeting as they jointly answered questions from FLC members. Thus, Appellant's position appears to be that unless then-President Judge Baratta and Appellant used the specific word "liaison" when describing her official duties, Appellant's actions, and speech, could not have been pursuant to her official duties. This upends the practical approach contemplated by the Supreme Court. *See Garcetti*, 547 U.S. at 422-23 (no consideration given to whether a specific instance of speech was expressly commissioned, but rather whether that type of speech was generally within the employee's duties).

In fact, Appellant admits she was working alongside and fielding questions with former Judge Baratta, who considered it his job to explain new procedures to the FLC. Appx1242, CSMF at ¶ 125 (Admitted). Whatever issues Appellant may have with the term "liaison," the fact remains that she was, by definition, liaising and doing so with the person she repeatedly describes in her brief as "her supervisor" by her side.

## III. The District Court did not abuse its discretion in striking Appellant's self-serving declaration.

A District Court's decision to strike a declaration is reviewed for abuse of discretion. *See SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 198 (3d Cir. 2022). A court abuses its discretion where its decision arises from "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Berger v. Hahnemann Univ. Hosp.*, 765 Fed. App'x. 699, 704 (3d Cir.

2019) (quoting *Johnston v. HBO Film Mgmt. Inc.*, 265 F.3d 178, 183 (3d Cir. 2001) (internal quotation marks and citation omitted)).

In the present case, Appellant submitted a meandering 13-page, 38-paragraph declaration from herself in response to Appellees' Motion for Summary Judgment, in which she responded, point-by-point, to various statements set forth in Appellees' Motion (the "Declaration"). Appx0921. As set forth more fully below, because this Declaration was replete with inadmissible evidence and was obviously submitted solely for the purpose of attempting to create a triable issue of fact, the District Court did not abuse its discretion in striking it. Appx0004, Order Striking Appellant's Declaration.

**A. The District Court properly exercised its discretion striking Appellant's Declaration.**

Declarations used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also W. Min. Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847, 848 (W.D. Pa.), *aff'd*, 745 F.2d 49 (3d Cir. 1984).

District Courts have discretion to strike a declaration for a host of reasons, including but not limited to: (i) that it "hedge[s] and speculate[s] to grasp at a factual conclusion (*see Timmons v. Bohinski*, No. 25-1516, 2026 U.S. App. LEXIS 24375, at *4 (3d Cir. Aug. 12, 2026)); (ii) that it recites legally irrelevant or

impertinent information (*see W. Min. Corp.*, 577 F. Supp. at 848); (iii) that it presents otherwise inadmissible evidence with no explanation as to how it would be presented in an admissible form at trial (*see Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238–39 (3d Cir. 2016)), and/or; (iv) that it is based on speculation and legal conclusions rather than statements of fact (*see York Int'l Corp. v. Liberty Mut. Ins. Co.*, No. 10-0692, 2015 LEXIS 88847, at *19-20 (M.D. Pa. July 9, 2015)).

In addition, a court may disregard an affidavit that is entirely unsupported by the record and contradictory to other testimony, or if the affidavit was offered solely to defeat summary judgment. *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 253-54 (3d Cir. 2007). While self-serving declarations are not always prohibited, the question is "whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature." *Parham v. May*, No. 16-6148, 2023 LEXIS 143788, at *19 (E.D. Pa. Aug. 15, 2023) (quoting *Johnson v. MetLife Bank, N.A.*, 883 F.Supp.2d 542, 549 (E.D. Pa. 2012)). Thus, courts in this circuit "have held that plaintiffs cannot defeat motions for summary judgment by relying solely on [their] self-serving [] testimony to create genuine issues of material fact." *Id*. (quotation omitted). *See also Gonzalez v. Sec'y. of Dep't. of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012).

Here, even a cursory review of the Declaration illustrates that the District Court's decision was not based on "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *See Berger, supra.* As an initial matter, the Declaration was obviously submitted for the sole purpose of trying to create a triable issue where none existed in the record, as evidenced by the pointed and responsive nature of each paragraph to the summary judgment motion. The Declaration is devoid of context, linear structure, or logical flow, and is instead comprised of a collection of random paragraphs that simply deny, *without record support*[17], specific statements made in Appellees' motion for summary judgment.

But even were this not the case, the District Court properly noted that the affidavit as a whole was unworthy of consideration given the dearth of admissible and material evidence it presented. The Declaration itself does not set forth the foundation for Appellant's averments as required under Rule 56. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion **must** be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

---

[17] Only three of Appellant's 38 paragraphs in the Declaration contain any citation to the record at all.

Further, the Declaration contains innumerable examples of inadmissible beliefs, speculation and/or legal conclusions. *See*, *e.g.,* Appx0921, at ¶ 1 (stating without foundation that "it was not a part of [her] job to" be a liaison with the FLC); ¶ 5 (claiming attorneys were "well aware" of what powers Appellant had over the Custody Division); ¶ 18 (speculating without support that a witness "profited financially" from submitting a declaration against Appellant); ¶¶ 22-23 (stating Appellant "believed [she] would be speaking not in [her] professional capacity as a custody master but as a private citizen . . . [and she] believed that [her] speech would be protected by the First Amendment."); ¶ 25 (asserting, without foundation, that Appellees "repeatedly harassed and intimidated attorneys" identified as witnesses). The Declaration is also riddled with hearsay. *See* Appx0921-30, at ¶¶ 2, 4, 6, 7, 8, 10-11, 13, 15-17, 24.

Finally, the Declaration fails to identify how any of this otherwise inadmissible evidence would be presented in an admissible form at trial, which renders it non-compliant with Rule 56. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238–39 (3d Cir. 2016) (stating that the proponent of a declaration must "explain the admissible form that is anticipated.").

### B. The District Court properly struck Appellant's Declaration where it attempts to misrepresent evidence already in the record.

The Declaration also attempts, through inadmissible hearsay, to recast evidence that is already in the record in a light more favorable to Appellant. By

way of example, Appellant claims in her Declaration that "Judge Koury had already told me that identifying and correcting judicial misconduct was not part of my job . . . ." Appellant's Brief, ECF 22, p.33; Appx0929. Except when the witness, Judge Koury, testified about this issue when deposed *by Appellant* at his deposition, he testified differently:

> I don't think that [Appellant's concerns were] a problem with the rules . . . [and i]f Ms. Tresslar believed that a judge was violating . . .the rules . . . then Ms. Tresslar under Rule 8.3 . . . would have an obligation to report that judge to the Judicial Conduct [Board]. It would not be discretionary.

Appx1235, CSMF at ¶ 113 (Admitted). It is his testimony, and not Appellant's contradictory hearsay statement about what he allegedly said, that is relevant. Because the District Court already considered this testimony in reaching its decision on summary judgment, Appellant's hearsay statement would not have rendered a different result. This supports the District Court's decision to strike Appellant's Declaration.[18]

In sum, the District Court clearly did not abuse its discretion in striking Appellant's eleventh-hour Declaration. Appellant cites no authority for her

---

[18] The Declaration is further suspect because it alternately refers to Plaintiff as "I," "she," "her," and "Tresslar," often within the same sentence. These errors are more than just typos: they show that the Declaration was patched together by counsel for the sole purpose of defeating summary judgment, which lends even less credibility to an already suspect Declaration. *See Jiminez*, 503 F.3d at 253 (stating that "the main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits," which "are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible.")

proposition that the Court was required to conduct a line-by-line analysis of an obviously improper declaration, because it was not. Such a position would only inure to bad actors and encourage the submission of the type of unwieldy affidavits at issue here.

Appellant had myriad opportunities to create the record she needed during litigation. Despite 20 depositions—17 of which were Plaintiff's—and over 4,000 pages of documents produced in discovery, the basis for Appellant's Declaration is nothing more than her own thoughts and suppositions. Appellant had every opportunity to query her own witnesses, including the attorneys with the FLC and the judges she attempts to speak for, and yet she submitted her declaration solely for the purpose of attempting to tear down the very record *she* created.

### C. Even if the District Court abused its discretion, striking the Declaration was harmless error.

As set forth at length above, summary judgment was appropriately granted to Appellees because Appellant's speech at the January 2023 FLC meeting was employee speech that was not entitled to First Amendment protection. Because nothing in Appellant's Declaration would have changed that finding, any alleged error in striking the Declaration would ultimately have been harmless. Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing

a judgment or order."); *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (holding that any error in striking an affidavit on summary judgment was harmless).

In this regard, even if the District Court had considered Appellant's unsupported averments, they would not have created a dispute of material fact. The vast majority of the statements set forth in Appellant's Declaration have nothing to do with her dealings with the FLC. And as set forth above, the few that do either are based entirely on Appellant's own beliefs and legal conclusions, or they had no bearing on the outcome the District Court reached. *See* Appx0017-0020 (setting forth the District Court's reasoning). As set forth *infra* (*see* Argument, § II), her argument regarding the "liaison" language misunderstands First Amendment law and tries to create a conflict where none exists, *i.e.* it is immaterial that no one told her to be a "liaison" where she was directed to interact and assist and, in fact, did interact and assist attorneys in their understanding of the RCGs as part of her ordinary duties.

## CONCLUSION

Based on the foregoing, Appellees respectfully request that this Court affirm the District Court's opinion granting summary judgment to Appellees and find that the District Court did not abuse its discretion in striking Appellant's self-serving declaration.

Respectfully Submitted,

***/s/ Jennifer L. Hope***
JENNIFER L. HOPE

***/s/ Megan Mallek***
MEGAN MALLEK

Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6326, Fax: (215) 560-5486

***Attorneys for Appellees the Honorable Craig A. Dally and District Court Administrator J. Jermaine Greene, Sr.***

## CERTIFICATE OF COMPLIANCE

1. The undersigned counsel certifies that she is a member in good standing of the Bar of this Court.

2. The Brief contains 11,582 words, not including the Title Page, Table of Contents, Table of Authorities, and Certificates. Certification is based on the word processor used to prepare the Brief.

3. The electronic brief's text is identical to the text in the paper copies filed with the Court.

4. A virus detection program has been run on the electronic brief filed in this Court and no virus has been detected. The virus protection program used is SentinelOne.

***/s/ Jennifer L. Hope***
JENNIFER L. HOPE

Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6326, Fax: (215) 560-5486

***Attorney for Appellees the Honorable Craig A. Dally and District Court Administrator J. Jermaine Greene, Sr.***